Henry J. KRIER and Badger Investment Realty, LLC f/k/a Vil-Kri Investments, LLC, Plaintiffs,

BADGER DISPOSAL OF WI, INC.,
Plaintiff-Appellant,

v.

Donald N. VILIONE and
Virchow Krause & Company, LLP,
Defendants-Respondents-Petitioners.

Henry J. KRIER, Badger Disposal of WI, Inc. and
Badger Investment Realty, LLC,
Plaintiffs-Appellants,

v.

Donald N. VILIONE and
Virchow Krause & Company, LLP,
Defendants-Respondents-Petitioners.

Supreme Court

*Nos. 2006AP1573, 2006AP2290. Oral argument November 6, 2008.—Decided June 10, 2009.*

2009 WI 45

(Also reported in 766 N.W.2d 517.)

For the defendants-respondents-petitioners there were briefs filed by *Ward I. Richter, William C. Williams, Bell Gierhart & Moore, S.C.*, Madison, and *Terry E. Johnson, Maria D. Sanders*, and *Peterson, Johnson & Murray, S.C.*, Milwaukee, and oral argument by *Ward I. Richter.*

For the plaintiffs-appellants there was a brief by *Robert J. Gingras, Michael J. Luebke, Eric J. Haag*, and *Gingras, Cates & Luebke, S.C.*, Madison, and oral argument by *Eric J. Haag.*

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published court of appeals' decision[1] that

---

[1] *Krier v. Vilione*, 2007 WI App 235, 306 Wis. 2d 147, 742 N.W.2d 537.

reversed and remanded the decision of the Milwaukee County Circuit Court, Jeffrey A. Kremers and Jean W. DiMotto, Judges.[2] The circuit court granted the defendants'—Virchow Krause & Company, LLP, and Donald Vilione (collectively hereinafter "the accountants")—summary judgment motion thereby dismissing the claims of the plaintiffs, Henry J. Krier and Badger Investment Realty, LLC (f/k/a Vil-Kri Investments, LLC), but as to the plaintiff, Badger Disposal of WI, Inc. (f/k/a EOG Disposal, Inc.),[3] the accountants were granted partial summary judgment in that only EOG Disposal's claim against the accountants for

---

[2] The Honorable Jeffrey A. Kremers granted the defendant's motion for summary judgment with respect to claims made by Henry J. Krier and Badger Investment Realty, LLC, and as a result, the circuit court ordered that all claims asserted by Henry J. Krier and Badger Investment Realty, LLC, be dismissed on their merits, with taxable costs and disbursements allowed by law. Judgment was then entered; however, taxable costs and disbursements were only awarded to Virchow Krause & Company, LLP. As a result, Donald Vilione filed a motion requesting a review of the decision of the judgment clerk. Following judicial rotation, the Honorable Jean W. DiMotto ordered that the judgment that was entered be amended to reflect that Donald Vilione could also recover his taxable costs and disbursements.

With respect to Badger Disposal's claims, the Honorable Jeffrey A. Kremers granted partial summary judgment, and as a result, an order was issued dismissing those claims asserted by Badger Disposal for any damages that it suffered by virtue of or related in any way to alleged thefts from EOG Environmental.

[3] Hereinafter, the plaintiffs will collectively be referred to as "the plaintiffs" when referring to all of them, but individually Henry J. Krier will be referred to as "Krier," Badger Investment Realty, LLC, will be referred to "Vil-Kri," and Badger Disposal of WI, Inc. will be referred to as "EOG Disposal."

$7,000 in damages survived because it arose out of Michael Vilione's alleged misappropriation from plaintiff, EOG Disposal. The court of appeals reversed the circuit court's dismissal of the plaintiffs' claims,[4] and as result, the accountants petitioned this court for review. We accepted review and now reverse the court of appeals' decision.

¶ 2. This case requires us to determine whether the plaintiffs, who are not shareholders in EOG Environmental,[5] have standing to make a claim against that corporation's accountants (who were also the plaintiffs' accountants) for damages because the accountants allegedly failed to disclose, failed to prevent, and assisted in the misappropriation of funds from EOG Environmental. The complaint alleges that had the accountants informed the plaintiffs of the misappropriations, they would have ceased doing business with EOG Environmental. The damages sought by the plaintiffs are not for damages due to EOG Environmental or for damages to the plaintiffs prior to the discovery of the misappropriations. Rather, the plaintiffs' expert calculates dam-

------

[4] The court of appeals granted EOG Disposal's petition for leave to appeal from Judge Kremers' nonfinal order limiting the damages that EOG Disposal can pursue. Judge Kremers dismissed Krier and Vil-Kri's claims in their entirety and judgment was entered. Because their dismissal was a final judgment, Krier and Vil-Kri filed a separate appeal. The court of appeals ordered Krier and Vil-Kri's appeal to be consolidated with EOG Disposal's interlocutory appeal.

[5] Michael Vilione and Krier shared ownership in EOG Environmental, EOG Disposal, and Vil-Kri. The plaintiffs' claims in this case originate from Michael Vilione's alleged misappropriation from EOG Environmental. The defendant accountants in this case served as the accountants for all three corporations.

ages for future, consequential loss to the plaintiffs despite the fact that they voluntarily and knowingly continued in a business relationship post-misappropriations. The expert calculates that the plaintiffs would have realized greater future profits had the accountants prevented one of EOG Environmental's owners from misappropriating funds or had the accountants warned the plaintiffs about the misappropriations. In other words, the plaintiffs allege that the accountants are liable to them even though the plaintiffs are separate and distinct entities with no shareholder interest in EOG Environmental, they voluntarily and knowingly continued to do business with that separate corporate entity, and they do not allege that they continued to do business based on any advice by the accountants.

¶ 3. We conclude that the court of appeals must be reversed because the summary judgment determination by the circuit court was correct. Therefore, we conclude that the plaintiffs, i.e., Vil-Kri, Krier, and EOG Disposal, lack standing to bring such claims against the accountants for their alleged role in the misappropriation of funds from EOG Environmental because, as explained in section III-A, ¶¶ 20–52, corporate law principles establish that the plaintiffs have no standing in this case, third-party liability precedent does not provide the plaintiffs with standing, and the damages claimed by the plaintiffs do not correspond with the claims alleged. However, as determined by the circuit court, EOG Disposal does have standing to assert claims against its own accountants, i.e., Donald Vilione and Virchow Krause & Co., for damages arising out of the accountants' actions when acting as EOG Disposal's accountant. To date, EOG Disposal has produced expert testimony to support a claim for $7,000 in damages.

¶ 4. Separately, as discussed in section III-B, ¶¶ 53–67, the plaintiffs' claims do not survive summary judgment because: (1) assuming the defendants owed the plaintiffs a duty of ordinary care, their negligence claims of accounting negligence, negligent training and supervision, and negligent misrepresentation would be barred on public policy grounds; and (2) their breach of fiduciary duty claim would be barred by the statute of limitations and the plaintiffs have not shown any damages that are tied to this claim.

## I. BACKGROUND

¶ 5. In 1991, Krier and Michael Vilione formed three different corporations: EOG Environmental, EOG Disposal, and Vil-Kri. EOG Environmental, which is a sales, marketing, and waste collection corporation, was formed as a C-corporation.[6] EOG Disposal, which received and disposed of waste products by virtue of working with other waste disposal companies, was formed as an S-corporation.[7] Vil-Kri, the owner of the building that EOG Disposal leased for its business, was formed as a limited liability company (LLC).[8]

¶ 6. EOG Environmental, the C-corporation, was owned by Michael Vilione (47.17%), Krier (47.17%), Jeff Vilione (5%), and Kandy Schmit (0.66%). EOG Disposal, the S-corporation, was owned by Michael Vilione (50%) and Krier (50%). Vil-Kri, the limited liability company, was owned by Michael Vilione (50%) and Krier (50%).

---

[6] *See* 2 Jay E. Grenig & Nathan A. Fishbach, *Wisconsin Practice Series, Method of Practice* § 50.12 (4th ed. 2004) (discussing C-corporations).

[7] *See* 2 Grenig & Fishbach, *supra,* § 50.13 (discussing S-corporations).

[8] *See* 2 Grenig & Fishbach, *supra,* § 50.14 (discussing limited liability companies).

¶ 7. Donald Vilione, i.e., the accountant, a partner in the accounting firm of Virchow Krause & Co., was the accountant for each of the three corporations and Krier's personal accountant until approximately January 31, 2003. Donald Vilione and Michael Vilione are brothers.

¶ 8. Between December 1, 1995, and December 11, 2002, Michael Vilione allegedly misappropriated over $1.2 million from EOG Environmental and $7,000 from EOG Disposal. Krier discovered the misappropriations in 2002, and as a result, he instituted litigation on January 3, 2003, against Michael Vilione alleging fraud and misappropriations of funds.[9]

¶ 9. On January 31, 2003, Krier and Michael Vilione reached a comprehensive settlement agreement with regard to that litigation. This was also the approximate date that Krier and his entities ceased to employ the accountants. In the settlement agreement, Michael Vilione became the sole owner of the C-corporation, EOG Environmental. As a part of that agreement, Krier conveyed all of his common stock in EOG Environmental to Michael Vilione. Also as a part of that agreement, Krier became the sole owner of the S-corporation, EOG Disposal, and he also became the sole owner of the limited liability company, Vil-Kri. Similarly, Michael Vilione conveyed all of his common stock in EOG Disposal to Krier. In addition, Michael Vilione sold his ownership interest in Vil-Kri to Krier

---

[9] *See Krier v. EOG Envtl., Inc.,* 2005 WI App 256, 288 Wis. 2d 623, 707 N.W.2d 915 (reviewing a motion to extend an order sealing the court record after the settlement agreement between Krier and Michael Vilione). The court of appeals indicates that Krier made claims against Michael Vilione for fraud and misappropriation of funds and "seriously considered" filing an action against the accountants. *Id.,* ¶¶ 1–6.

for the sum of $95,000. However, Michael Vilione and Krier also agreed to continue doing business together for approximately the next two years. As part of the agreement, all debts Krier owed to EOG Environmental were eliminated and all debts Michael Vilione owed to EOG Disposal and Vil-Kri were eliminated. In addition, under the agreement Krier, EOG Disposal, and Vil-Kri released Michael Vilione and EOG Environmental from all claims "from the beginning of time to the date of execution of th[e] Release." In the agreement, Michael Vilione and EOG Environmental also released Krier, EOG Disposal, and Vil-Kri of all claims "from the beginning of time to the date of execution of th[e] Release." However, in the agreement, Krier, EOG Disposal, and Vil-Kri reserved the right to file an action against Michael Vilione's brother, i.e., Donald Vilione, who was the accountant. Donald Vilione was not a party to that lawsuit or the settlement agreement.

¶ 10. On January 20, 2005, nearly two years after Krier had divested himself of any interest in EOG Environmental and approximately two years from filing the lawsuit regarding the misappropriations, Krier, EOG Disposal, and Vil-Kri[10] filed an action against the accountants. The plaintiffs alleged that had the accountants informed them of the misappropriations from EOG Environmental or stopped the misappropriations, they would have ceased to do business with EOG Environmental. They then offer an expert's opinion that the misappropriation of funds from EOG Environmental caused the plaintiffs' businesses to have a future, consequential reduced value. The plaintiffs' com-

---

[10] Subsequent to the settlement agreement, Krier changed the name of EOG Disposal to Badger Disposal, Inc. and Vil-Kri to Badger Investments Realty, LLC.

plaint asserted ten causes of action: violation of Wis. Stat. § 134.01 (2007–08),[11] injury to business; civil conspiracy; accounting negligence; breach of fiduciary duty; negligent training and supervision; negligent misrepresentation; strict responsibility misrepresentation; misrepresentation-intentional deceit; violation of Wis. Stat. §§ 895.80 (2003–04) and 943.20, civil theft; and violation of the Wisconsin Organized Crime Control Act. In short, the plaintiffs allege that the defendants either (1) failed to discover the alleged misappropriations; (2) knew of the misappropriations but "fail[ed] to disclose" or prevent them; or (3) "acted together" "purposefully" and "intentionally" with Michael Vilione to allegedly misappropriate the funds.

¶ 11. Even though the complaint is that had the accountants acted properly, the plaintiffs would have ceased doing business with EOG Environmental, the plaintiffs' expert renders an opinion about post-misappropriation damages. The expert essentially opines that post-settlement and after the accountants no longer worked as the plaintiffs' accountants, EOG Disposal and Vil-Kri would have produced greater income had Michael Vilione not previously misappropriated funds from EOG Environmental. In fact, the plaintiffs' expert characterized the loss—naming it "the Krier Loss"—at approximately $11 million.[12] The plain-

---

[11] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[12] The expert came to this mathematical conclusion by using the following methodology and stating so in the expert witness report number two, page five:

In my opinion the Krier Loss is the difference between (i) the value as of June 30, 2005 that the EOG Entities would have had, absent the Vilione Stealing ($33,445,000) (the "Projected Entities Value"), multiplied by [] Krier's 47.17% ownership percentage

300

tiffs' expert also concluded that the accountants caused a $7,000 loss to EOG Disposal when acting as EOG Disposal's accountant. The accountants do not appeal the determination that the $7,000 claim survives summary judgment.

¶ 12. At the circuit court, the accountants' motion for summary judgment was based on the premise that the plaintiffs were precluded as a matter of law from recovering damages because they lacked standing to assert a claim for relief based on alleged misappropriation from EOG Environmental. As outlined previously, the circuit court granted the accountants' summary judgment motion with the exception that EOG Disposal could continue its claim so long as the damages were not based on the initial misappropriation from EOG Environmental, i.e., the $7,000 loss survives. After hearing a motion to reconsider by the plaintiffs, the circuit court confirmed its initial summary judgment determination. The circuit court reasoned that Krier could not assert a claim for damages done to the corporations, and EOG Disposal and Vil-Kri failed to

---

($15,776,007)( . . . ); and (ii) the value of [Krier's] ownership interest as of June 30, 2005 in Disposal and [Vil-Kri] ($4,000,000)( . . . ). The difference between these two amounts, $11,776,007, is the Krier Loss related to the Vilione Stealing.

We note, however, two potential problems with this calculation. First, as discussed later, these numbers are in part based off a separate corporation, EOG Environmental, to which Krier no longer has any ownership or stock interest. Second, to the extent this calculation is appropriate, Krier's loss is likely less than approximately $11 million because that figure represents his interest in all three corporations had they grown. However, Krier has an interest in only two of the three corporations. The $4 million figure presumably represents Krier's current interest in the two companies and not what would have been his interest had no "misappropriations" taken place.

show they suffered any "direct" damages because of the accountants' conduct except that EOG Disposal showed it suffered a $7,000 loss due to the actions of the accountant.

¶ 13. The plaintiffs appealed, and the court of appeals reversed the circuit court's decision and remanded. The court of appeals concluded that "(1) the trial court failed to follow the standard methodology when it determined that summary judgment was appropriate; (2) accountants are liable for all damages that flow from their misconduct; and (3) Krier has standing to recover damages."

## II. STANDARD OF REVIEW

¶ 14. "Whether the circuit court properly granted summary judgment is a question of law that this court reviews de novo." *Schmidt v. N. States Power Co.*, 2007 WI 136, ¶ 24, 305 Wis. 2d 538, 742 N.W.2d 294. This court applies the same standards as those used by the circuit court, which are set forth in Wis. Stat. § 802.08, *id.*, but we benefit from the lower courts' analyses. Whether a party has standing presents a question of law that we also review de novo. *Zellner v. Cedarburg Sch. Dist.*, 2007 WI 53, ¶ 14, 300 Wis. 2d 290, 731 N.W.2d 240.

## III. ANALYSIS

¶ 15. In this appeal, the plaintiffs argue that the defendant accountants are liable to them because they allegedly failed to discover, prevent, or because they played a role in the misappropriation of funds from EOG Environmental by Michael Vilione. The crux of

the plaintiffs' claim for damages relates to the fact that they would have discontinued doing business with EOG Environmental had they known of the misappropriations. The plaintiffs' expert renders an opinion regarding the diminution in value of the plaintiffs' entities, which occurred post-settlement and after the accountants were no longer the plaintiffs' accountants. The expert opines that the plaintiffs' business decreased as a result of the misappropriation of assets from EOG Environmental. The record reflects that the plaintiffs chose to continue conducting business with EOG Environmental, regardless of the misappropriations and it is not alleged that the accountants played any role in that decision.

¶ 16. The accountants, on the other hand, argue that the plaintiffs lack standing to assert such claims for relief because the plaintiffs are not current shareholders of EOG Environmental and allowing such claims to proceed would unreasonably expand accountant liability.

¶ 17. We agree with the accountants and therefore reverse the court of appeals' decision.

■

¶ 18. In summary: The plaintiffs do not have standing to assert these claims against the defendant for at least three reasons. First, the plaintiffs' claims are inconsistent with traditional corporate law principles and the damages sought are far beyond that afforded to a plaintiff in a derivative action. In order to initiate a derivative action, a plaintiff must be a current shareholder of the subject corporation. Second, the plaintiffs' claims are quite distinguishable from accountant third-party liability jurisprudence, which has traditionally allowed claims for the foreseeable injuries resulting from the accountant's negligent acts, i.e., the

injuries that result when a third party takes action based upon reasonable reliance on misinformation provided by an accountant. Third, the damages claimed by the plaintiffs do not correspond with the claims alleged.

¶ 19. Separately, as discussed in section III-B, ¶¶ 53–67, the plaintiffs' claims do not survive summary judgment because: (1) assuming the defendants owed the plaintiffs a duty of ordinary care, their negligence claims, as discussed in ¶¶ 54–57, of accounting negligence, negligent training and supervision, and negligent misrepresentation would be barred on public policy grounds; and (2) as discussed in ¶¶ 58–67, their breach of fiduciary duty claim would be barred by the statute of limitations and the plaintiffs have not shown any damages that are tied to this claim.

A. Standing

¶ 20. While an accountant has a duty to his or her client and may have a duty to a third party under certain circumstances, that party must still have standing to bring an action. " 'Standing' is a concept that restricts access to judicial remedy to those who have suffered some injury because of something that someone else has either done or not done." *Three T's Trucking v. Kost,* 2007 WI App 158, ¶ 16, 303 Wis. 2d 681, 736 N.W.2d 239. The law of standing should be liberally construed, and as such, standing is satisfied when a party has a personal stake in the outcome. *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 228–30, 332 N.W.2d 782 (1983). However, the plaintiffs must show that they suffered or were threatened with an injury to an interest that is legally protectable. *Chenequa Land Conservancy, Inc. v. Vill. of Hartland,*

2004 WI App 144, ¶¶ 13–16, 275 Wis. 2d 533, 685 N.W.2d 573. Being damaged, however, without more, does not automatically confer standing. The universe of entities or people who could be affected or damaged by a corporation that ceases to do business is without bounds.

¶ 21. In this case, the plaintiffs assert that their claims are viable because they are not praying for damages to EOG Environmental. Rather, they are seeking damages to their corporate entities and personally because the misappropriation from EOG Environmental caused a diminution in the value of their corporations—EOG Disposal and Vil-Kri—and Krier's stock in those corporations. However, the complaint alleges that had they been properly informed, they would have ceased doing business with EOG Environmental.

¶ 22. While the law of standing is to be liberally construed, this theory of liability set forth by the plaintiffs is not recognized in Wisconsin jurisprudence, and we will not pave the way for such relief with today's decision because corporate law principles establish that the plaintiffs have no standing to seek these damages in this case. Third-party liability precedent does not convey standing to the plaintiffs, and the damages claimed by the plaintiffs do not correspond with the claims alleged. While we certainly do not condone accountant misconduct, the plaintiffs in this case do not have standing to bring these claims for these damages.

1. Corporate law principles

■

¶ 23. The plaintiffs' argument regarding standing has never before been acknowledged in Wisconsin law, and if the plaintiffs' claims were to survive, there would

be no stopping point to liability. Absent additional facts that would support a corresponding responsibility, separate corporate entities do not have standing to seek the relief sought in this case. The lack of any stopping point provides support for the logic behind these long-standing corporate principles. If the plaintiffs' claims were to survive, any business could sue another business's advisor whenever that business advice negatively affects a plaintiff's business. These plaintiffs do not have standing to bring an action for damages to EOG Environmental. The fact that the plaintiffs have been affected by the misappropriations is not enough to confer standing upon them to seek these damages.

¶ 24. In this case, each of the three corporations are separate corporate entities. Each corporation was specifically classified: a C-corporation, an S-corporation, or a limited liability company. *See* 2 Jay E. Grenig & Nathan A. Fishbach, *Wisconsin Practice Series, Methods of Practice* §§ 50.10—50.16 (4th ed. 2004) (discussing the difference between each type of corporation and when to use and not to use each entity). The plaintiffs cannot pick and choose when they would like to operate separately and when they would like to operate as one corporation. Their business's interdependence does not blur the entities' distinct corporate structures.

¶ 25. A particular type of corporation may be the preferred method of doing business for any number of reasons including tax and liability implications, *see id.* at §§ 50.1, 50.20—50.36, and these individuals chose to operate a business by creating separate and distinct corporate entities. Presumably, Krier and Michael Vilione made a conscious decision to create three different corporations with different types of corporate entities to carry out their operations. While they likely enjoyed

certain advantages from doing business as three separate corporate entities, they also are bound by the disadvantages of forming separate corporations. *See Terry v. Yancey,* 344 F.2d 789, 790 (4th Cir. 1965) (stating "where an individual creates a corporation as a means of carrying out his business purposes he may not ignore the existence of the corporation in order to avoid its disadvantages").

¶ 26. The plaintiffs essentially assert that because the entities function as one overall business, corporate principles ought to be overlooked in the interest of justice. However, when Krier and Michael Vilione were joint owners of the three entities, if one of their corporate entities were being sued, Krier and Michael Vilione would not likely suggest that the corporations were actually interdependent such that the assets of all three entities would be available for damages. In fact, in a business such as waste disposal, there may be deliberate reasons to separate the entity that holds assets from other entities that might have greater exposure to liability. One cannot maintain the corporate structure when it inures to one's benefit and then ignore the constraints of corporate law when it does not. These parties formed separate entities that remain separate entities.

¶ 27. We would abandon fundamental corporate law principles if we accepted the plaintiffs' theory of standing and liability. *Fletcher Cyclopedia of the Law of Corporations* provides that a corporation does not "have independent standing to sue for injuries done to a sister or subsidiary corporation, despite the fact that their businesses are intertwined and the success of one is dependent on that of the other." 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 36 at 95–96 (perm. ed., rev. vol. 2006) (citing *Picture*

*Lake Campground, Inc. v. Holiday Inns, Inc.*, 497 F. Supp. 858 (E.D. Va. 1980)).

¶ 28. By way of example, in *Picture Lake*, a sister corporation of Picture Lake—First Management—alleged that the actions of Holiday Inns destroyed the value of First Management. *Picture Lake*, 497 F. Supp. at 860–61. Picture Lake and Holiday Inns entered into a franchise agreement to develop a travel park. *Id.* First Management owned and leased the property to Picture Lake, and Picture Lake operated the travel park business. *Id.* at 862. When Holiday Inns allegedly breached the licensing agreement with Picture Lake and discontinued development of the travel park, First Management argued that the entities' operations were so intertwined that it—being a sister corporation of Picture Lake—should be able to make a claim against Holiday Inns. *Id.* at 862–63. The court concluded that Picture Lake did not have standing to pursue its claim. *Id.* Relying on the fact that a choice to create separate entities must be honored, the court concluded:

> First Management has no independent standing to sue simply because the business and property interest of First Management and Picture Lake are allegedly intertwined and dependent upon the success of the Trav-L-Park system.
>
> To have standing to sue for damages for tortious injury to business or property, First Management must have an interest in the business or property allegedly injured. In addition, just as a stockholder of a corporation has no standing to sue third parties for wrongs inflicted by those third parties upon the business and property interest of the corporation, it is evident that First Management has no standing to sue Holiday Inns for wrongs allegedly inflicted by Holiday Inns on the business or property interest of Picture Lake. Moreover, the Court believes that First Management has no

> standing to sue for injuries inflicted indirectly or consequentially upon the business or property interest of First Management as a result of the alleged tortious conduct of Holiday Inns towards Picture Lake. The parties have not cited and the Court is not aware of any authority to the contrary.

*Id.* at 863 (citation and footnote omitted).

¶ 29. The damages to EOG Environmental belong to EOG Environmental and as a result, EOG Environmental or its shareholders could have made a claim against the accountants. However, Krier, as an individual who is not a current shareholder of EOG Environmental, lacks standing to file an action on EOG Environmental's behalf and even if he was a current shareholder, his standing would be in the form of a derivative action rather than a direct action.

¶ 30. Had Krier, when he was a shareholder of EOG Environmental, brought a derivative action to recover the corporate loss, EOG Environmental would have been made whole in 2002. Had EOG Environmental been made whole at that time, plaintiffs' current claims for consequential damage would be nonexistent. When Krier was still a shareholder of EOG Environmental, he had an opportunity to significantly limit or eliminate the future damages that he now seeks to recover. Instead he chose to enter into a new business relationship and now wishes to recover for that choice. ■■ ■■

¶ 31. It is logical then that when misappropriations from a corporation occur, the right of action belongs to the corporation. *See Rose v. Schantz*, 56 Wis. 2d 222, 229, 201 N.W.2d 593 (1972) (stating that " '[r]ights of action accruing to a corporation belong to the corporation, and an action at law or in equity, cannot be maintained by the members as individuals' "

309

(citation omitted)). At most, even if the accountant was assisting his brother with the misappropriations from EOG Environmental, Krier's right to recovery would have to be as a shareholder of EOG Environmental, not in his own stead or as another affected entity. *Id.* (stating "[w]here the injury to the corporation is the primary injury, and any injury to stockholders secondary, it is the derivative action alone that can be brought and maintained"). While it is clear that primary and direct injury to a corporation may have a subsequent impact on the value of the stockholders' shares, that subsequent impact is not enough to create a right to bring a direct, rather than derivative, action. *Id.* When money is being misappropriated or stolen from a corporation, the damage is to the corporation, and as a result, the appropriate action is a derivative action and not a direct action.[13] *See* 12B William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* §§ 5911, 5913, 5924 (perm. ed., rev. vol. 2009) (asserting that generally misappropriation, waste, and mismanagement only give rise to derivative actions); *but see id.,*

---

[13] The dissent asserts that we fail to apply the test for determining whether the action is direct or derivative. Hogwash; when corporate funds are misappropriated, the injury to the corporation is the primary injury even though shareholders suffer from those misappropriations. In order for a shareholder to have an independent claim, the injury must be "one to the plaintiff as a shareholder as an individual, and not to the corporation[;] for example, where the action is based on a contract to which the shareholder is a party, or on a right belonging severally to the shareholder, or on a fraud affecting the shareholder directly, or where there is a duty owed to the individual independent of the person's status as a shareholder, it is an individual action." 12B William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 5911 (perm. ed., rev. vol. 2009). Therefore, a derivative action and not a direct action is appropriate in this case.

310

§ 5924.10 (asserting that some courts may allow a direct action where plaintiff and defendant are both 50% shareholders).

¶ 32. In this case, however, Krier can no longer even bring a derivative action based on the misappropriations from EOG Environmental because he is no longer a shareholder in EOG Environmental. *See* Wis. Stat. §§ 180.0103, 180.0741. " 'Shareholder' means the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." Wis. Stat. § 180.0103. Therefore, to have standing pursuant to Wis. Stat. § 180.0741, one must be a current shareholder to initiate a claim on behalf of the corporation.[14]

The dissent also asserts this case is inconsistent with *Notz v. Everett Smith Group, Ltd.,* 2009 WI 30, ¶ 27, 316 Wis. 2d 640, 764 N.W.2d 904, because, in *Notz,* this court concluded that a plaintiff could bring a direct action when a constructive dividend was distributed to only some shareholders and not others. Our decision is not inconsistent with *Notz* because acting shareholders have a right to dividends paid on a pro rata basis equivalent to their ownership of corporate stock. Embezzlement, however, is distinguishable from a dividend. An injury from not receiving a dividend is to the shareholder. The injury from the embezzlement is to the corporation. A misappropriation is not a constructive dividend. Therefore, this case is unlike *Notz* or *Jorgensen v. Water Works, Inc.,* 2001 WI App 135, 246 Wis. 2d 614, 630 N.W.2d 230, where plaintiffs did not receive their dividends or pro rata cash flow to which they were entitled. Here the injury is to the corporation.

[14] *See Portnoy v. Kawecki Berylco Indus., Inc.,* 607 F.2d 765, 767 (7th Cir. 1979) (interpreting similar Federal Rule of Civil Procedure 23.1, Derivative Actions, in a like manner and stating that the underlying rationale is that "because a share-

¶ 33. If the plaintiffs' theory were to survive and they were allowed to bring a claim for damages to their entities because of a misappropriation to a separate entity to which they have no status as shareholder, they would be placed in a better position than a shareholder of the victim corporation. Certainly a shareholder of the victim corporation should not be placed in an inferior status to third-party entities that were affected by the misappropriation. We know that a shareholder does not have the right to pursue those individual damages for the affect of wrongdoing to a corporation. *Rose,* 56 Wis. 2d at 229. In fact, the shareholder would only have status of a derivative nature to bring action on behalf of the corporation. *Id.* Under the theory advanced by the plaintiffs, we would actually be placing a shareholder who is directly affected by the misappropriation in a far inferior position to plaintiffs who are consequentially affected. Since a shareholder lacks standing to make a direct claim for such damages, *id.,* it follows that a distinct entity would not have greater standing than the shareholder.

¶ 34. Because Krier is a shareholder of EOG Disposal and Vil-Kri, he may be able to bring a derivative action against the accountant for the accountants' failures with regard to Michael Vilione's misappropriations

holder will receive at least an indirect benefit (in terms of increased shareholder equity) from any corporate recovery, he has an adequate interest in vigorously litigating the claim. A non-shareholder or one who loses his shareholder interest during the course of the litigation may lose any incentive to pursue the litigation adequately"). This does not address, however, whether one who once was a shareholder and initiated a lawsuit while being a shareholder can continue that lawsuit when he or she is no longer a shareholder.

from EOG Disposal or Vil-Kri. *Rose,* 56 Wis. 2d at 229; *see* Wis. Stat. §§ 180.0103, 180.0741. However, that standing is distinct from Krier's standing to bring an action for such injury to EOG Environmental, and Krier cannot now seek damages from the accountants because action with respect to a separate corporation has caused his business to be less lucrative. In short, the assets of a corporation belong to that corporation. *Rose,* 56 Wis. 2d at 229. Krier relinquished any right to the assets of EOG Environmental or any such derivative claim when he relinquished his ownership in that corporation two years previous with knowledge that the assets of EOG Environmental had been depleted. It stretches the bounds of imagination to conclude that one who has no right to sue on behalf of the corporation can then maintain a lawsuit based upon a sister corporation's diminution in value because a misappropriation to the separate corporation affected another business.

## 2. Third-party liability

¶ 35. The plaintiffs fail to provide the court with any third-party liability authority that would lead us to recognize that they have standing to pursue these claims for these damages. The plaintiffs fail to set forth any case that goes so far as to let Corporation X file an action against Corporation Y's accountant for the accountant's failures with regard to the work he performed for Corporation Y solely because the financial problems of Corporation Y caused less growth in the value of Corporation X. The plaintiffs' claims fall short of showing a breach of an independent duty that the accountant owed to them and how these damages resulted from that breach. The plaintiffs' claims paint with too broad of a brush.

¶ 36. The trial court aptly illustrated the flaw of applying third-party liability to the case at issue and how that theory would expand liability. The trial court outlined that if someone was stealing from a car-seat maker that supplied General Motors and the thefts resulted in General Motors being unable to pay bills because it could not make cars without seats, under the plaintiffs' theory, General Motors could bring an action against the car-seat maker's accountant—who is also General Motors' accountant—for his failures. This hypothetical illustrates the absurdity of the plaintiffs' argument. If the plaintiffs' theory prevailed, there would be no limit to the kinds of claims that other persons who have a "relationship" with a corporation could bring, and thus, available claims for relief would only be limited by one's imagination.

¶ 37. The extent to which an accountant can be held liable to a third party has been addressed by Wisconsin law in *Citizens State Bank v. Timm, Schmidt & Co., S.C.*, 113 Wis. 2d 376, 335 N.W.2d 361 (1983) and *Chevron Chemical Co. v. Deloitte & Touche*, 168 Wis. 2d 323, 483 N.W.2d 314 (Ct. App. 1992), but the facts before this court here are distinguishable from the facts of those cases. The nexus in those cases between the accountant's acts and the resultant damages have a sound basis in law and fact, but to extend such third-party jurisprudence to the facts of this case would run afoul of those logical principles and open the floodgates to litigation. This logic stands consistent with Wisconsin's adoption of the minority viewpoint of *Palsgraf v. Long Island Railroad Co.*, 162 N.E. 99 (N.Y. 1928) (Andrews, J., dissenting) and our precedent that there can also be a limit to the scope of a duty and to when and where that duty may arise.[15]

---

[15] *See Baumeister v. Automated Prods., Inc.*, 2004 WI 148, ¶¶ 18–21, 277 Wis. 2d 21, 690 N.W.2d 1 (concluding that the

314

¶ 38. · The plaintiffs, relying on *Citizens* and *Chevron* in an attempt to show standing, argue that their third-party liability claims are firmly rooted in Wisconsin law. However, while third-party liability is recognized in Wisconsin, the cases cited by the plaintiffs are distinguishable from the allegations and the proof of damages in the case at issue. In this case, the plaintiffs do not allege or show any damages based upon detrimental reliance on information provided by the accountants like in *Citizens* and *Chevron*.

¶ 39. In *Citizens*, the Timm accounting firm prepared financial statements and an opinion letter for Clintonville Fire Apparatus, Inc., to use in obtaining a loan. Timm represented that "the financial statements fairly presented the financial condition of [Clintonville Fire Apparatus] and that the statements were prepared in accordance with generally accepted accounting principles." *Citizens*, 113 Wis. 2d at 378. Based on those

architect did not have a duty to supervise the construction of a church because the architect's contract stated he had no responsibility for construction of the church); *Hatleberg v. Norwest Bank Wis.*, 2005 WI 109, ¶¶ 19–25, 283 Wis. 2d 234, 700 N.W.2d 15 (concluding that a trustee of a bank did not have a duty to review a trust document to ascertain whether it worked for the stated purpose of the trust); *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶¶ 31–40, 291 Wis. 2d 283, 717 N.W.2d 17 (concluding that the duty of ordinary care for the bank did not include responsibility for subcontractor's payments because the lender's contract said the lender had no responsibility with regard to paying the subcontractors or with obtaining subcontracting lien waivers); *Nichols v. Progressive N. Ins. Co.*, 2008 WI 20, ¶ 47, 308 Wis. 2d 17, 746 N.W.2d 220 (stating "[w]hile liability has been limited in a negligence case based on the absence of a duty, liability in the vast majority of negligence cases in Wisconsin is guided, when determining whether to limit liability, by consideration of public policy factors").

documents, Citizens Bank loaned Clintonville Fire Apparatus approximately $380,000 between 1975 and 1976. *Id.* at 378–81. In 1976, Timm discovered that the 1974 and 1975 financial statements contained a number of material errors totaling over $400,000. *Id.* at 378. Once the errors were corrected, Citizens Bank called its loans due, and as a result, Clintonville Fire Apparatus went into receivership and was liquidated and dissolved. *Id.* at 378–79. Because Citizens Bank had loaned those amounts in reliance on the accountant's work, Citizens Bank filed an action against Timm for malpractice. *Id.* at 379–81. Citizens Bank sought damages for the unpaid amounts due on its loans to Clintonville Fire Apparatus. *Id.* at 379.

¶ 40. This court determined that privity of contract was not required in order for the accountant to be liable to a third party and instead concluded that accepted principles of Wisconsin negligence law should govern. *Id.* at 386. In *Citizens,* the accountant prepared the documents with client approval as to disclosure and knowing that the bank would rely on the documents in order to make loan decisions. Therefore, it stands to reason that the accountant could reasonably anticipate liability for that malpractice. *Id.* at 388.

¶ 41. Similarly, in *Chevron* the court of appeals applied this same logic when assessing third-party liability of an accountant. In *Chevron,* the American Fuel & Supply Co., Inc. hired Deloitte to independently audit American Fuel. *Chevron,* 168 Wis. 2d at 327–28. As a part of that audit, Deloitte prepared a report of American Fuel's financial statements. American Fuel distributed copies of the reports to its creditors, one of which was Chevron. *Id.* at 328. In early 1986, Deloitte discovered that the audit was in error due to American Fuel's "rebilling" practice. *Id.* Because of the error,

316

American Fuel's financial statements reflected it making a profit when in reality it was operating at a deficit. *Id.* However, before that error was discovered, Chevron relied upon the 1985 financial statements in its decisions to extend credit to American Fuel for certain purchases. *Id.* When Deloitte discovered the incorrect audit report, it urged American Fuel to recall the report, but American Fuel refused. *Id.* When Deloitte indicated its intent to withdraw the audit and advise any entity relying upon it, American Fuel threatened legal action against Deloitte because such disclosure would breach Deloitte's duty to American Fuel. *Id.* at 328–29. American Fuel filed for bankruptcy on April 23, 1987, and in 1989, Chevron filed an action against Deloitte alleging both negligence in the audit and misrepresentation based upon Deloitte's failure to notify Chevron of the withdrawn report. *Id.* at 329. Chevron sought to recover from Deloitte the amounts due from American Fuel and interest as a result of Chevron relying on the accountant's work to extend credit to American Fuel. *Id.* at 341–42.

¶ 42. Because the accountant prepared the statements in *Chevron,* knowing that a third party would rely upon them, and the third party took action based on those financial statements to their specific detriment, the accountant could be held responsible on the basis of third-party liability. *Id.* at 334–35.

¶ 43. *Citizens* and *Chevron* provide significant guidance regarding third-party liability of an accountant. While privity of contract is not required for an accountant to be liable to a third party, these cases demonstrate the kind of foreseeable reliance to one's detriment that can reasonably create a third-party cause of action against an accountant. In both *Citizens* and *Chevron,* the accountant, the third party, and the

317

accountant's client formed a "triangular-relationship." The client relied on the third party to receive a loan, and the third party relied on the accountant's documentation to determine whether to loan the money. In *Citizens* and *Chevron,* the accountant, the client, and the bank or creditor were all aware of the fact that the statements were prepared for the bank or creditor to review and that based upon that information, the bank or creditor would decide whether to loan money or extend credit. As a result, the accountant could reasonably be held liable to that third party for his or her malpractice.

¶ 44. In order for an accountant to bear responsibility to a third party, the third party must have done something to its detriment based upon the accountant's information. Here, there is no such claim that the plaintiffs took action in reliance on information provided by the accountants. The plaintiffs do not claim that they relied on the accountants' inaccurate work product and as a result, loaned money to the other corporations or took action to their detriment.

¶ 45. Unlike *Citizens* or *Chevron,* the plaintiffs do not make claim for a specific loss that was caused by their relying on the accountants' misinformation. At most, the plaintiffs assert that the accountants, Michael Vilione, and Krier attended a meeting in January of 1999 where Krier inquired about the state of the "enterprise," but that the accountants did not inform Krier at that time about the misappropriations and instead told Krier that the corporations were not worth anything. The plaintiffs' claims and damages here, however, do not relate to any loss caused to them by the accountants' statements at this meeting. They do not allege damages based on action that they took because

318

of the accountants' statements. The accountants' statements in this meeting do not tether to quantifiable damages alleged here by the plaintiffs.

¶ 46. The case before the court is distinguishable from *Citizens* and *Chevron,* and it does not remedy the plaintiffs' problem that the damages are to EOG Environmental. At most, the plaintiffs' proof shows that the value of EOG Disposal and Vil-Kri was diminished because of the misappropriations from EOG Environmental, and as a result, EOG Disposal was not able to expand its facilities. As stated previously, however, the plaintiffs' claims against the accountants for diminished value are not viable under the facts of this case. The plaintiffs' claims and the future consequential damages they seek are far removed from the facts of *Chevron* or *Citizens.*

3. Damages

¶ 47. The parties spend a significant amount of time arguing over the damages calculation made by the plaintiffs' expert. While the calculation is certainly questionable, we have other concerns regarding the damages sought by the plaintiffs.

¶ 48. First, the expert's calculation of damages is based upon future, consequential damages post-settlement of the misappropriation claim. The origination of the damage calculation is remotely based upon the alleged misappropriation of funds from EOG Environmental. The plaintiffs' complaint alleges that they would have ceased to do business with EOG Environmental had they known of the misappropriations. However, the expert's calculations do not support that allegation.

¶ 49. Second, the plaintiffs assert that had they known about the misappropriations they would have

ceased doing business with EOG Environmental and thus limited their potential damages. However, this assertion is disingenuous because the plaintiffs voluntarily continued to do business with EOG Environmental even though the plaintiffs claim that they would have ended the business relationship. After learning of the misappropriations and filing suit against Michael Vilione, Krier settled his claims with Michael Vilione. As part of that settlement agreement, Krier chose to relinquish all status as a shareholder, not file an action while he was a shareholder, and instead agreed to continue a business relationship with Michael Vilione's corporation—a separate corporate entity—for two years. It is not alleged that the accountants had any role in that decision to continue doing business together.

¶ 50. Additionally, despite knowing of the misappropriations and even contemplating making claims against the accountants around the time of the settlement agreement, Krier did not bring any claims against the accountant at that time. Rather, two years after relinquishing all status as a shareholder, he filed this lawsuit against the accountants for unrealized business growth to his separate corporate entities.

¶ 51. In summary, the plaintiffs knew of the alleged misappropriations in 2002; they filed a lawsuit for that alleged wrongdoing, but only against the other shareholder. Krier did not seek relief for EOG Environmental by derivative claim; the record indicates that the plaintiffs contemplated making a claim against the accountants in the 2002 lawsuit but did not. The plaintiffs continued to do business with the alleged wrongdoer for another two years post-settlement and now claim that they would have ceased to do business with that corporation had the accountants told them of the misappropriations; and, the damages the plaintiffs

seek relate to the two-year time period when they continued to do business post-settlement.

¶ 52. Simply stated, the plaintiffs' claims for future consequential damages fail considering the allegations of the complaint. The plaintiffs claim they would have ceased doing business with EOG Environmental had they known of the misappropriations and that the accountants shirked their responsibility in not warning them of the misappropriations. However, the plaintiffs contracted to do business with EOG Environmental for two years after knowing about the misappropriations. Now they wish to recover from another for that knowing and voluntary choice.

B. Plaintiffs' claims are not otherwise viable

¶ 53. Separately, the plaintiffs' claims would not survive summary judgment for the following reasons: First, the negligence claims in this case could also be precluded on public policy grounds. Second, the plaintiffs' breach of fiduciary duty claim is barred by the statute of limitations and the plaintiffs' damages are not tied to this claim.

1. Negligence claims

¶ 54. Aside from the reasons set forth thus far, the plaintiffs' claims could also be precluded on public policy grounds. Despite that "a plaintiff adequately establishes all four elements of a common-law negligence claim, Wisconsin courts have 'reserved the right to deny the existence of a negligence claim based on public policy reasons . . . .'" *Nichols v. Progressive N.*

*Ins. Co.,* 2008 WI 20, ¶ 19, 308 Wis. 2d 17, 746 N.W.2d 220 (citing *Hoida, Inc. v. M&I Midstate Bank,* 2006 WI 69, ¶ 24, 291 Wis. 2d 283, 717 N.W.2d 17). The relevant factors to be considered are as follows: "(1) the injury is too remote from the negligence; (2) the recovery is wholly out of proportion to the culpability of the negligent tort-feasor; (3) the harm caused is highly extraordinary given the negligent act; (4) recovery would place too unreasonable a burden on the negligent tort-feasor; (5) recovery would be too likely to open the way to fraudulent claims; and (6) recovery would enter into a field that has no sensible or just stopping point." *Hoida,* 291 Wis. 2d 283, ¶ 41, (citations and internal quotations omitted).

¶ 55. Public policy is therefore another basis for precluding the plaintiffs' claims. First, as we discussed above with regard to this case, there would be no sensible or just stopping point if the plaintiffs' claims prevailed. If the plaintiffs' claims were to survive, any business could sue another business's advisor whenever that business advice negatively affects the plaintiffs' business, even if the plaintiff chooses to remain in business with the wrongdoer. In other words, the plaintiffs' claims assume that they have a right to require a separate entity to continue to do business in a manner that benefits them and that a business advisor of that entity has a duty to keep them abreast of that other entities' wellbeing. The plaintiffs' theory would open the floodgates to litigation.

¶ 56. Second, the damages sought by the plaintiffs would have no sensible stopping point. Had the parties decided to do business for four years instead of two, would they be entitled to twice as much in damages? Moreover, if the plaintiffs' theory survived, an accoun-

tant could be subjected to paying endless damages to multiple claimants for the same alleged wrongful act. For example, if EOG Disposal was to recover from the accountants, nothing would preclude any other affected entity from also filing an action against the accountants. Absent some special relationship between that accountant and the entities, corporate law principles do not provide support for the alleged avenue of relief. In this case, a new party claims to be affected by another entities' reduced value. Could a third party then sue these plaintiffs and recover for the fact that the third party was not warned of EOG Environmental's corporate shortcomings despite the fact that the plaintiffs here knew of the misappropriation at EOG Environmental? Where would it stop?

¶ 57. Third, fraudulent claims could flourish under the plaintiffs' theory because corporations could assert that they would have done business differently and thus been more profitable had they known the full financial status of the other corporation; yet how does one necessarily know what a corporation would have done had they known about another's financial troubles? These questions also bear out the lack of a sensible stopping point.

2. Breach of fiduciary duty claim

■

¶ 58. While we do not approve of or encourage accountants to breach any fiduciary duty owed to a client, the breach of fiduciary duty claim in this case is not viable because the statute of limitations bars that claim. Any misappropriation by Michael Vilione, which the accountants allegedly assisted in, occurred between 1998 and 2002 pursuant to the plaintiffs' complaint. Yet, the plaintiffs did not bring any claims against the

accountants until January 20, 2005. Wisconsin Stat. § 893.57 bars such claims two years after the cause of action accrues.[16] In this case, the plaintiffs knew of the accountants' potential role before January 20, 2003, given Krier was concerned about Michael Vilione's expenditures in the fall of 2002, believed he could not discuss his financial concerns with the accountants, commenced a lawsuit against Michael Vilione on January 3, 2003, and "seriously considered filing suit against the accountant" at that time. The plaintiffs ceased to employ the accountants on or about that same date as the January 31, 2003, settlement agreement. Thus, the statute of limitations bars the plaintiffs' January 20, 2005, claim for breach of fiduciary duty.

¶ 59. However, even if the breach of fiduciary duty claim was not barred by the statute of limitations, the breach of fiduciary duty claim would not survive summary judgment in this case for three reasons.

¶ 60. First, the plaintiffs have not shown any damages that are tied to this claim. The damages here do not relate to misappropriations that occurred prior to 2002, which is when the alleged breach of duty would have occurred. Rather, any damages here are for a time period after the lawsuit was brought against Michael Vilione, and as a result, the damages do not support a breach of fiduciary duty claim.

¶ 61. Second, the plaintiffs, in part, base their breach of fiduciary duty claim on the allegation that the accountants allegedly concealed and conspired with Michael Vilione to misappropriate funds from EOG Environmental and that they fraudulently represented the financial status of the corporations in January of

---

[16] The discovery rule could otherwise impact this analysis.

1999. However, the summary judgment record is devoid of anything that would support such allegations.

¶ 62. Third, the plaintiffs, in part, seem to assert that the defendants should have informed the plaintiffs of the misappropriations from EOG Environmental and by failing to make such disclosures, the defendants breached a duty to the plaintiffs. We disagree.

¶ 63. The plaintiffs seek to impose a much broader duty on an accountant to inform any other person or entity when that accountant's client is in financial trouble and that trouble could impact the other's business in the future.

¶ 64. The plaintiffs do not allege that the accountants in this case, like in *Citizens* and *Chevron,* had a duty to Krier personally or his entities that were breached and resulted in corresponding damages. Instead, the plaintiffs allege that had the accountants done their job properly, the plaintiffs would have ceased doing business with EOG Environmental. The plaintiffs do not allege the accountants breached a duty that corresponds with the expert testimony of damages.

■

¶ 65. Moreover, an accountant who discloses information about another client could breach the accountant's duty of confidentiality. *See* Wis. Admin. Code § Accy 1.301 (May 2004) and American Institute of Certified Public Accountants (AICPA) Code of Conduct, §§ 301 and 391 (providing rules governing confidentiality and examples).[17] Even though Krier and the

---

[17] An accountant's duty of confidentiality is governed by Wis. Admin. Code § Accy 1.301 (May 2004). It provides: "(1) No person licensed to practice as a certified public accountant shall disclose any confidential information obtained in the course of a professional engagement except with the consent of the client

other corporations did business with EOG Environmental, this does not automatically eliminate the accountants' duty of confidentiality to EOG Environmental. While Krier, as an owner of EOG Environmental, would have learned of the misappropriations if the accountants would have informed EOG Environmental of Michael Vilione's actions, this does not automatically transform the misappropriation from EOG Environmental into a viable claim for future damages to Krier or his entities personally because they chose to continue to do business with the entity after knowing of the misappropriations.

¶ 66. While it has some appeal to ignore the separate corporate status in the case at hand because two individuals jointly own the three corporations, the accountants' duty of confidentiality is not complicated in a more traditional setting. When entities have a separate and distinct corporate status, if and when an accountant discovers a problem with one corporation, the accountant does not have an automatic duty to inform all clients who may have an interest in doing business with the corporation of that corporation's shortcomings. Here, assuming that the accountants discovered the misappropriations at EOG Environmental, the accountants' duty to inform may extend to EOG Environmental or Michael Vilione and Krier in their capacities as shareholders, but that duty does not automatically extend to separate entities such as Krier, EOG Disposal, or Vil-Kri. In this case, the allegations in

---

or through the due process of law." While an accountant's duty of confidentiality is not without exception, *see* § Accy 1.301(2), an accountant's duty to his or her client is difficult to circumvent.

the complaint and the plaintiff expert's opinion regarding damages do not correspond to an alleged breach of duty by the accountant.

¶ 67. If the plaintiffs had any viable claim against the defendants with regard to breaching a duty that an accountant owes a client, it would likely be in regard to a conflict of interest violation.[18] Instead, at most, the plaintiffs claim that they would have ceased to do business with EOG Environmental earlier had they discovered the misappropriations. The facts bear out that even after they knew of the misappropriations, they continued to do business together.

## IV. CONCLUSION

¶ 68. We conclude that the court of appeals' decision must be reversed because the summary judgment determination by the circuit court was correct. Therefore, we conclude that the plaintiffs, i.e., Vil-Kri, Krier,

---

[18] The American Institute of Certified Public Accountants (AICPA) Code of Conduct, which has been specifically incorporated by reference in this state instructs as follows: Section 101.02, in relevant part, entitled "Application of the Independence Rules to Close Relatives."

Independence would be considered to be impaired if—

1. An individual participating on the attest engagement team has a close relative who had

a. A key position with the client, or

b. A financial interest in the client that

(i) *Was material to the close relative and of which the individual has knowledge[.]*

(Emphasis added.) *See* Wis. Admin. Code § Accy 1.101; *see also* AICPA Code of Conduct, § 101.02. The code of conduct defines "close relative" as a "parent, sibling, or nondependent child." *See* AICPA Code of Conduct, § 92.04.

and EOG Disposal, lack standing to bring such claims against the accountants for their alleged role in the misappropriation of funds from EOG Environmental because, as explained in section III-A, ¶¶ 20–52, corporate law principles establish that the plaintiffs have no standing in this case; third-party liability precedent does not provide the plaintiffs with standing, and the damages claimed by the plaintiffs are not based upon viable claims. However, as determined by the circuit court, EOG Disposal does have standing to assert claims against its own accountants, i.e., Donald Vilione and Virchow Krause & Co., for damages arising out of the accountants' action when acting as EOG Disposal's accountant. To date, EOG Disposal has produced expert testimony to support a claim for $7,000 in damages.

¶ 69. Separately, as discussed in section III-B, ¶¶ 53–67, the plaintiffs' claims do not survive summary judgment because: (1) assuming the defendants owed the plaintiffs a duty of ordinary care, their negligence claims of accounting negligence, negligent training and supervision, and negligent misrepresentation would be barred on public policy grounds; and (2) their breach of fiduciary duty claim would be barred by the statute of limitations and the plaintiffs have not shown any damages that are tied to this claim.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 70. ANN WALSH BRADLEY, J. (*dissenting*). I agree with the analysis and conclusion of a unanimous court of appeals that the plaintiffs "have asserted their own claims for damages, which are separate from those that could allegedly be claimed by EOG Environmental." *See Krier v. Vilione,* 2007 WI App 235, ¶ 24, 306 Wis. 2d 147, 742 N.W.2d 537. "[A]s parties claiming to

have been injured by [the accountants'] malpractice, they seek to recover damages that *they* incurred." *Id.*, ¶ 26. Therefore, the plaintiffs' "interests are more than sufficient to confer standing." *Id.*, ¶ 25.

¶ 71. The majority, however, disagrees with the court of appeals and concludes that Henry Krier has no standing to assert a claim. It determines that Krier's claims are not his own, but rather are claims that could only be made by shareholders of EOG Environmental. *See* majority op., ¶ 31.

¶ 72. Even if we would assume that the majority was correct and that standing to bring these claims could be conferred solely on shareholders of EOG Environmental, the majority erroneously concludes that Krier, as a shareholder, would be entitled to bring only a derivative claim. *See id.* Instead, the conclusion should be that Krier can maintain a direct claim for an injury primarily to himself as a shareholder of EOG Environmental.

¶ 73. I write separately to highlight the majority's cursory and erroneous analysis of the issue actually presented and to emphasize that its conclusion directly contradicts this court's recent decision in *Notz v. Everett Smith Group, Ltd.*[1] Additionally, I take issue with the majority's mischaracterization of the plaintiffs' allegations and its unbridled tendency to reach out and decide issues not briefed in this case. Accordingly, I respectfully dissent.

I

¶ 74. Henry Krier was a 47 percent shareholder in EOG Environmental until 2003. He has produced evidence that, over a period of four years, EOG

---

[1] 2009 WI 30, 316 Wis. 2d 640, 764 N.W.2d 904.

Environmental's director and shareholder Michael Vilione routinely took money from the corporation for his personal use. A partial list of Michael's personal "withdrawals" from corporate accounts includes: checks payable directly to Michael or his wife totaling $469,640; $98,502 for household expenses for Michael's family; $85,583 for Michael's automobile expenses; another $182,608 for what appear to be more personal and household expenses, and an $11,000 payment on the purchase of a vacation home in Palm Springs, California.

¶ 75. Krier alleges that EOG Environmental's accountant, Donald Vilione, "knowingly falsified the accounting records for the enterprise to cover up and conceal the misappropriation of enterprise funds[.]" A report submitted by Krier's expert accountant lists various accounting tricks used in furtherance of this purpose. The complaint alleges a number of interrelated claims including accounting negligence, negligent misrepresentation, breach of fiduciary duty, conspiracy, injury to business, and violation of the Wisconsin Organized Crime Control Act.[2]

¶ 76. The issue is whether Krier has standing to maintain a direct action against the accountants. The answer depends on whether their actions resulted in an injury primarily to Krier, or an injury primarily to the corporation. *See* majority op., ¶ 31 (citing *Rose v.*

---

[2] The majority specifically discusses the breach of fiduciary duty claims and the negligence claims, *see* majority op., ¶¶ 53–67, but it fails to specifically address others. It is not clear what happens to the remainder of these interrelated claims. For instance, it is difficult to see how the majority's analysis provides a legal basis for dismissing the plaintiffs' claim that the defendants violated the Wisconsin Organized Crime Control Act.

*Schantz,* 56 Wis. 2d 222, 229, 201 N.W.2d 593 (1972)). As we have previously explained, when an injury is primarily to a shareholder, that shareholder can bring a direct cause of action. *Rose,* 56 Wis. 2d at 228–29. When the injury is primarily to the corporation, a shareholder derivative action is appropriate. *Id.* at 229.

¶ 77. On the question of whether the injury was primarily to the corporation or to Krier, the majority's analysis is brief and conclusory: "It is logical . . . that when misappropriations from a corporation occur, the right of action belongs to the corporation." Majority op., ¶ 31. Thus ends the analysis.[3]

¶ 78. Wisconsin case law provides no explicit test for determining when an injury is "primarily to the corporation." *Notz,* 316 Wis. 2d 640, ¶ 23. The only articulated test is for whether an injury is "primarily to an individual shareholder." *Id.* That test is found in *Jorgensen v. Water Works, Inc. (Jorgensen II),* 2001 WI App 135, ¶ 16, 246 Wis. 2d 614, 630 N.W.2d 230.

---

[3] The majority correctly quotes from Fletcher that "generally," misappropriation gives rise to derivative actions only. See majority op., ¶ 31 (citing 12B William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* §§ 5911, 5913, 5924 (perm. ed., rev. vol. 2009)). However, it fails to set forth additional quotes from Fletcher that undermine its conclusion: "A shareholder may sue to redress direct injuries to him or herself regardless of whether the same violation injured the corporation." 12B Fletcher, *supra,* § 5911. "While the misappropriation . . . of corporate property or assets ordinarily generates a claim in the corporation or derivatively in its shareholders, minority shareholders may have an individual cause of action in an appropriate case for damages that they alone have sustained, as where majority shareholders have profited but plaintiff minority shareholders have been wronged by a fraudulent sale of corporate assets." *Id.* § 5924.

¶ 79. In *Jorgensen II*, three couples were the sole directors of a close corporation and they owned equal shares. *Id.*, ¶¶ 2–3. Following a dispute, the Jorgensens were removed as directors, and the corporation stopped paying the Jorgensens weekly director's fees. *Id.*, ¶ 4.

¶ 80. The circuit court determined that "it was obvious" that these director's fees were "related to profits of the corporation" rather than salaries paid "as compensation for work done." *Id.*, ¶ 6. That is, the court concluded that the fees were in reality distributions of the corporation's profits.

¶ 81. The court of appeals concluded that an injury is "primarily an injury to an individual shareholder" when it "affects a shareholder's rights in a manner distinct from the effect upon other shareholders." *Id.*, ¶ 16. When the shareholder's rights are violated in a manner that "inflict[s] a harm on [the shareholder] that other shareholders did not suffer," the shareholder has a direct cause of action. *Id.*, ¶ 18. Because the corporation stopped paying the Jorgensens distributions that other shareholders received, the court concluded that the Jorgensens' rights were affected in a manner distinct from the effect upon other shareholders, and were thus entitled to bring a direct claim. *Id.*

¶ 82. In this case, however, the majority fails to apply the *Jorgensen II* test.[4] Without analysis, the

---

[4] The majority takes issue with this statement, labeling it "hogwash." *See* majority op., ¶ 31, n.13. Such a response lends credence to the old adage, "When you have the law on your side, argue the law; when you have facts on your side, argue the facts; and when you have neither, holler." The majority's hollering, however, is no substitute for analysis.

The majority never examines whether the injury inflicted harm on Krier that Michael Vilione did not suffer or whether it

332

majority states that "when misappropriations from a corporation occur, the right of action belongs to the corporation." *See* majority op., ¶ 31. The majority never examines whether Krier's rights were affected in a manner distinct from the effect upon another shareholder, Michael Vilione.

¶ 83. When the *Jorgensen II* test is faithfully applied, however, one must conclude that Krier's rights were affected in a manner distinct from the effect upon Michael Vilione. According to the allegations, Michael was paying himself a direct distribution of EOG Environmental's profits, unrelated to any work that Michael did for the corporation. Due to the misappropriation and the coverup, the value of Krier's investment was driven into the ground. At the same time, Michael Vilione directly profited. This is not a case where all shareholders were affected equally by misappropriation from the corporation. Instead, the injury was primarily to Krier, and he can assert a direct claim against Donald Vilione.

II

¶ 84. In addition to its failure to apply the primary injury test, the majority's conclusion directly contradicts our recent holding in *Notz v. Everett Smith Group Ltd*. *See* 316 Wis. 2d 640. The inevitable result is confusion in the law.

¶ 85. In *Notz,* this court held that when a "constructive dividend" is distributed to some shareholders but not to others, the shareholders who did not receive

affected Krier's rights "in a manner distinct from the effect upon" Michael Vilione. Instead, in a conclusory fashion, the majority ultimately determines that "[h]ere the injury is to the corporation" because "injury from the embezzlement is to the corporation." *See* majority op., ¶¶ 31, 31 n.13.

the dividend can bring a direct claim. 316 Wis. 2d 640, ¶¶ 4, 27. In that case, the corporation had the opportunity to acquire another business. *Id.*, ¶ 9. The corporation conducted due diligence, but ultimately, the directors and controlling shareholder caused the corporation to pass on acquiring the business. *Id.* Instead, the directors and controlling shareholder purchased the business themselves. *Id.* A minority shareholder brought suit, alleging that the directors and controlling shareholder had breached a fiduciary duty and that he sustained an injury primarily to himself as a result. *See id.*, ¶ 10.

¶ 86. To be clear, there were no actual "dividends" paid in *Notz. See id.*, ¶ 24. Nonetheless, this court focused on the fact that the due diligence expenditure financially benefitted the controlling shareholder, but the minority shareholder received no corresponding financial benefit. *Id.*, ¶ 27. The court determined that the money paid for due diligence could be considered a "constructive dividend" or a "dividend-like payment." *Id.*, ¶¶ 4, 27. Because the minority shareholder did not receive any benefit from this "constructive dividend," his "rights as a shareholder were affected 'in a manner distinct from the effect upon other shareholders,' " and he could bring a direct action for breach of fiduciary duty.[5] *Id.*, ¶ 27 (citing *Jorgensen II,* 246 Wis. 2d 614, ¶ 16).

¶ 87. The giving of the "constructive dividend" in *Notz* differed little from putting a check for that amount directly in the pocket of the controlling share-

[5] I did not join the *Notz* majority, in part because I was unsure of what the court meant by the term "constructive dividend," as it was not defined in *Notz* or in any of our case law. However, if the term "constructive dividend" applied to the facts alleged in *Notz,* it is also applicable here.

holder. The court in *Notz* concluded that this same type of disparate treatment "was at issue in *Jorgensen II* because the defendants had 'stopped paying plaintiffs the pro rata distribution from the corporation's cash flow while they continued to pay themselves regular distributions' " and therefore " 'they treated plaintiffs differently, and inequitably, when compared with the treatment accorded all other shareholders.' " *Id.*, ¶ 27 (citing *Jorgensen II*, 246 Wis. 2d 614, ¶ 18).

¶ 88. In this case, Michael Vilione was the sole "beneficiary" of the embezzled funds and "there was never any intention for [Krier] to benefit in any way" from the money that was taken out of the corporation. *See id.* The funds that Michael Vilione took from EOG Environmental were not paid as compensation for his services to the corporation. Instead, it is alleged that they were misappropriated corporate profits. With Donald Vilione's assistance, Michael in essence put a check for over $1.2 million of the corporation's profits directly into his own pocket. Krier did not, and it was never intended that he would receive a corresponding share.

¶ 89. This case and *Notz* are in direct conflict. In *Notz,* one shareholder got a disproportionate financial benefit. It was as though one shareholder was able to put money in its pocket while another was not. The court concluded that because one shareholder did not receive the same financial benefit as the other, a direct claim could be maintained. In this case, Michael Vilione actually did put corporate money in his pocket, yet the majority concludes that Krier, who did not receive the benefit, has no direct claim. Ultimately, due to this conflict with *Notz*, the majority here confuses the law, giving practitioners and judges no real guidance.

## III

¶ 90. The majority's analysis is further undermined when it repeatedly misstates the central allegations of the plaintiffs' complaint. Time and time again throughout the opinion, the majority states: "The complaint alleges that had the accountants informed the plaintiffs of the misappropriations, they would have ceased doing business with EOG Environmental." Majority op., ¶ 2; *see also id.* ¶¶ 10, 11, 15, 21, 48, 49, 51, 52, 67.

¶ 91. Nowhere in the complaint can you find the allegation as misstated by the majority. Instead the allegation the majority apparently relies upon provides that he would have discontinued his partnership with Michael Vilione:

> Had Henry Krier been aware of the fact that defendant Vilione was assisting and conspiring with his brother Michael Vilione to misappropriate and convert money and fraudulently conceal the true financial state of the companies, then Mr. Krier would not have continued to employ defendants Vilione and Virchow Krause as accountants, *nor would he have continued to associate with Michael Vilione as a business partner,* nor would he have allowed the misappropriation and conversion of company monies.

Complaint ¶ 39 (emphasis added).

¶ 92. Indeed, that is exactly what Krier did in 2002 after he found out about the misappropriations. He discontinued associating "with Michael Vilione as a business partner." As set forth in the allegations of the complaint, he concluded that Michael Vilione was engaging in an illegal activity, embezzling money from the corporation as well as cheating on taxes.

¶ 93. The complaint alleges that Michael Vilione cheated the IRS by charging the corporation for a variety of personal expenses that were not deductible business expenses, including $98,502 for household expenses, $85,583 for family automobile expenses, another $182,608 for what appear to be more personal and household expenses, and an $11,000 partial payment on the purchase of a vacation home in Palm Springs, California. See complaint, ¶¶ 28, 30. If these allegations are true, it is no wonder that Krier no longer wanted "to associate with Michael Vilione as a business partner."

¶ 94. Krier, however, never alleged that he wanted to discontinue doing business with EOG Environmental. Quite to the contrary. At least for a period of time, his financial success was in part tied to having a continuing relationship with EOG Environmental.

¶ 95. In certain circumstances, the majority's misstatement may be nothing more than a minor error. Here, however, the majority misstates the allegation and then characterizes this misstated allegation as the "crux" of the plaintiffs' claim for damages: "The crux of the plaintiffs' claim for damages relates to the fact that they would have discontinued doing business with EOG Environmental had they known of the misappropriations." Majority op., ¶ 15.

¶ 96. Having denominated this misstated allegation as the "crux" of the plaintiffs' claim for damages, the majority then proceeds to build its entire damage analysis on this misstatement. The majority's analysis of damages is set forth in paragraphs 47–52. The misstated allegation appears in paragraph 48, twice in paragraph 49, and again in paragraphs 51 and 52.

¶ 97. The majority's analysis is but a house of cards that must fall because it misunderstands the

"crux" of the plaintiffs' argument and builds its analysis on a foundation of repeated misstatement.

## IV

¶ 98. Finally, the majority's lengthy discussion obfuscates what is really at issue in this case. Instead of focusing its discussion on the issue presented, the majority reaches out and raises all manner of issues not found in the parties' briefs—resolving them all in favor of the defendants.

¶ 99. As Chief Justice John Roberts has stated, a judge's job is like an umpire's—"to call balls and strikes, and not to pitch or bat."[6] The majority should focus on calling the pitch that the defendants have thrown and keep off the playing field.

¶ 100. The majority has determined that because the plaintiffs are not current shareholders of EOG Environmental, they cannot assert a derivative claim. Thus, the issue presented is whether they have standing to bring a direct claim against the accountants. This was the issue that the defendants argued in their motions for partial summary judgment and the issue that defendants raise in their briefs to this court.

¶ 101. Nevertheless, the majority reaches out and decides the following issues:

> 1. A fiduciary duty can be limited in scope by public policy considerations, majority op., ¶ 37—not briefed.

---

[6] Confirmation Hearing on the Nomination of John G. Roberts, Jr., to be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 56 (2005) (statement of John G. Roberts), available at http://www.cnn.com/2005/POLITICS/09/12/roberts.statement/index.html.

2. The negligence claims must be precluded on public policy grounds, *id.,* ¶¶ 54–57—not briefed.

3. The breach of fiduciary duty claim is barred under the statute of limitations for intentional torts, *id.* ¶ 58—not briefed.

> Curiously, the majority adds a footnote indicating that it is applying the bar and dismissing the claim without any consideration of an essential part of the analysis—the discovery rule. *See id.,* ¶ 58, n.16.

4. "[T]he summary judgment record is devoid of anything that would support" the allegations that the defendants "concealed and conspired with Michael Vilione to misappropriate funds from EOG Environmental and that they fraudulently represented the financial status of the corporations," *id.,* ¶ 61—not briefed.

5. Defendants did not breach a fiduciary duty to disclose information to the plaintiffs, *id.,* ¶¶ 62–67—not briefed.

¶ 102. I do not weigh in on the unbriefed issues that occupy so much of the majority's attention. Opinions of this court should not "reach out and decide issues that were not presented to the court by the parties." *Dairyland Greyhound Park, Inc. v. Doyle,* 2006 WI 107, ¶ 335, 295 Wis. 2d 1, 719 N.W.2d 408 (Roggensack, J., concurring in part and dissenting in part).

¶ 103. For the reasons set forth above, I respectfully dissent.

¶ 104. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent.

Rudy NEDVIDEK, Commander of
VFW Post 1530 and Tom Hundt, individually,
and as President of Vietnam Era Veterans,
Plaintiffs-Appellants-Petitioners,

v.

Judith L. KUIPERS, Ex-Chancellor of U.W.L.,
Douglas N. Hastad, Ex-Chancellor of U.W.L.,
Katherine Lyall, Ex-President of U.W. System
and Ex officio member of the Board of Regents
and University of Wisconsin Board of Regents,
Defendants-Respondents.

Supreme Court

*No. 2006AP3075. Oral argument February 5, 2009.
—Decided June 10, 2009.*

2009 WI 44

(Also reported in 766 N.W.2d 205.)

For the plaintiffs-appellants-petitioners there were briefs by *James P. Grenisen,* La Crosse, and oral argument by *James P. Grenisen.*

For the defendants-respondents there was a brief and oral argument by *F. Thomas Creeron III,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. PER CURIAM. Plaintiffs petitioned for review of an unpublished decision[1] of the court of appeals, which affirmed the circuit court's decision[2] dismissing the plaintiffs' claims on mootness and standing grounds. After examining the record and the briefs of the parties, and after hearing oral argument, we conclude that the petition for review was improvidently granted.

¶ 2. In October of 1945, the City of La Crosse passed a resolution to construct a recreational facility including a football stadium, which it named Veterans Memorial Stadium. On February 2, 1988, the city quitclaimed the facility to the University of Wisconsin Board of Regents (Board of Regents), and it became part of the University of Wisconsin-La Crosse (UWL) facilities. A use agreement from the city, executed as part of the quitclaim deed, allegedly required the Uni-

¶ 7. ANN WALSH BRADLEY, J., did not participate.