COURT OF APPEALS
DECISION
DATED AND FILED

January 27, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP1709**

Cir. Ct. No.  2020CV559

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

APPVION, INC. RETIREMENT SAVINGS AND EMPLOYEE STOCK OWNERSHIP PLAN, BY AND THROUGH GRANT LYON,

   PLAINTIFF-APPELLANT,

 V.

PRICEWATERHOUSECOOPERS LLP,

   DEFENDANT-RESPONDENT,

RSM US LLP,

   DEFENDANT.

---

APPEAL from orders of the circuit court for Outagamie County: TAMMY JO HOCK, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   This case involves just one aspect of the Appvion, Inc. Retirement Savings and Employee Stock Ownership Plan's (the ESOP) overall attempt to recover damages its employee participants suffered when paper company, Appvion, Inc., and its parent company, Paperweight Development Corporation (PDC),[1] filed bankruptcy in October 2017, and the stock in PDC, which was 100% owned by the ESOP, became worthless.

¶2     This lawsuit specifically targets PricewaterhouseCoopers LLP (PwC), which audited the financial statements of Appvion and PDC from 2001 to 2014, and essentially asserts that PwC was negligent for failing to uncover Appvion's management and professional advisors' fraud.  Specifically, the ESOP alleges that PwC was negligent in performing its audits and negligently misrepresented Appvion's financial condition, resulting in the ESOP purchasing Appvion stock at a price above fair market value.  As a result, the ESOP suffered substantial damages from the loss of the retirement funds invested when Appvion filed for bankruptcy protection.

¶3     At issue in this appeal are the circuit court's orders granting PwC's motion to dismiss, after concluding that the ESOP could not maintain professional

---

[1] Appvion was known as Appleton Papers, Inc., until it changed its name to Appvion in 2013.  For simplicity, we will refer to the company throughout as "Appvion."  Our references to Appvion in this decision are distinct from the ESOP.

PDC was a holding company that had no separate income or operations, and any references herein to Appvion's finances are also referring to PDC's finances.  Going forward, we will also refer to Appvion and PDC, collectively, as "Appvion."

negligence or negligent misrepresentation claims against PwC, and denying the ESOP's motion for reconsideration of that decision and motion for leave to amend the complaint. The court determined that because PwC was not *the ESOP's* auditor, it was not reasonably foreseeable that the ESOP would have relied on PwC's audit opinions to fairly state the value of Appvion's stock. The ESOP challenges that conclusion on appeal. For the reasons that follow, we agree with the circuit court's decision and affirm.

## BACKGROUND

¶4 The following factual allegations are taken from the ESOP's complaint and are assumed to be true for purposes of this appeal.[2] *See **Data Key Partners v. Permira Advisers LLC***, 2014 WI 86, ¶¶18-19, 356 Wis. 2d 665, 849 N.W.2d 693. After the former owner of Appvion attempted unsuccessfully for years to sell the business, Appvion's management proposed an employee buyout to make the company 100% employee-owned. On November 9, 2001, PDC was formed to serve as Appvion's parent company, and PDC purchased Appvion for $810 million. On that same date, the ESOP purchased 10,684,373 shares of PDC's stock (100%) for $10 a share—a total price of $106,843,730.

¶5 The ESOP was a trust designed to provide retirement benefits to eligible employees. The ESOP consisted of both a traditional 401(k) component and an employee stock ownership plan component. "The employee beneficiaries chose how much to defer to the plan and the size of each component."

---

[2] We also note that within this opinion, our review considers documents in the record beyond the ESOP's complaint, pursuant to the incorporation-by-reference doctrine. *See **Soderlund v. Zibolski***, 2016 WI App 6, ¶¶37-38, 366 Wis. 2d 579, 874 N.W.2d 561 (2015).

Approximately 90% of Appvion's employees participated in the ESOP, using funds from their 401(k) savings to purchase Appvion stock through the plan. The ESOP committee, comprised of Appvion's CEO and other senior executives, was responsible for the plan's day-to-day management and served as its fiduciary. The plan required that its assets be used to purchase company stock at no more than fair market value, as determined by an independent appraiser and approved by the ESOP's trustee.

¶6      During the period relevant to this case, the ESOP's trustees were State Street Global Advisors (2001–2013), Reliance Trust Company (2013–2014), and Argent Trust Company (2014 on). From 2001 to 2004, Willamette Management Associates served as the ESOP's independent appraiser and prepared the ESOP's stock valuations, and from 2005 to 2016, Stout Risius Ross performed that function. These "'independent' valuation experts" were required "[b]ecause the ESOP was the sole shareholder and [Appvion's] stock was not publicly traded." Both firms used "the discounted cash flow" and "the guideline company" methods to determine Appvion's enterprise value, subtracted debt, made adjustments for limited marketability, and divided by the number of shares to arrive at a per-share price.[3]      Appvion's management supplied the financial

---

[3] In the related federal case, the United States Court of Appeals for the Seventh Circuit provided an explanation of the valuation procedure as follows:

> The appraiser calculated the fair market value of Appvion, based in part on financial projections provided by Appvion's directors and officers and in part on Appvion's assets and liabilities. The appraiser gave that valuation to the trustee, which used it to set the new price of a share of Appvion. The ESOP Committee then reviewed and approved the price set by the trustee, reported it to the Plan participants, and used it to approve purchases and sales of Appvion's shares. The price varied over time, starting at $10 per share in the 2001 sale, reaching a high of $33.62 by the end of 2006, and gradually falling to a low of $6.85 in 2016.

(continued)

4

projections used in these valuations. Although employees received notice of the stock purchase price, they were not provided with the valuation reports.

¶7 PwC audited Appvion's financial statements from 2001 to 2014, and RSM US LLP did so from 2015 to 2016. PwC's and RSM's audit opinions were incorporated into Appvion's annual Form 10-K filings with the Securities and Exchange Commission, which included Appvion's audited financial statements and were distributed to employees. According to the complaint, these filings were "specifically offered to the employees to help them make the ongoing decision of whether to invest their paycheck savings into the ESOP."

¶8 In August 2017, Grant Lyon was appointed as the ESOP committee's sole member, replacing its former members. Upon review of the valuations and financial statements, Lyon "quickly concluded" that Appvion's stock purchase price "had been fraudulently and materially overstated." He identified multiple flaws in Willamette's and Stout's methodologies, including failures to deduct material debt; reliance on inflated earnings before interest, taxes, depreciation, and amortization projections; and the improper application of control premiums.

¶9 On October 1, 2017, Appvion filed for bankruptcy protection. Under the bankruptcy plan, the ESOP's shares of Appvion became worthless, causing participants—the employees—to lose their investments. In November 2018, the ESOP filed a federal lawsuit raising "an avalanche of claims against dozens of individuals and corporations," with the "central theory" being

---

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 938-39 (7th Cir. 2024). Going forward, we refer to this variable price as the stock purchase price.

5

that Appvion's management and professional advisors "fraudulently inflated the price of Appvion in 2001," which caused the ESOP to purchase the stock for more than fair market value, and "the price remained inflated until Appvion's bankruptcy." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 937 (7th Cir. 2024).

¶10 The ESOP filed this suit against PwC and RSM on July 15, 2020, alleging claims for intentional misrepresentation, negligent misrepresentation, professional negligence, and aiding and abetting fraud. The ESOP sought "to recover … damages resulting from PwC's and RSM's fraudulent and negligent audit-related misrepresentations and professional negligence for each year they audited [Appvion's] financial statements." The ESOP alleged that PwC and RSM, through their audits, would and should have identified the defects in Appvion's stock valuation, but they failed to act. It claimed that accepted auditing standards required PwC and RSM to evaluate the stock valuations performed by others before relying on them in support of the accuracy of Appvion's financial statements. According to the ESOP, "[h]ad PwC and RSM not been negligent, they would have either required that Appvion correct the stock price or refuse to certify the financial statements," and then "the ESOP and its employee beneficiaries would have been alerted to the inflated stock prices and would not have continued to overpay for [Appvion] stock."

¶11 PwC and RSM separately moved to dismiss the ESOP's complaint. Following a nonevidentiary hearing, the circuit court issued a 15-page order on August 1, 2023, dismissing the ESOP's claims in their entirety. The court dismissed the intentional misrepresentation claims because the ESOP had "not

sufficiently alleged [PwC and RSM] knew the representations they made in their audit opinions were not true" and had not alleged "how following the PCAOB[4] standards would have provided [PwC and RSM] with the knowledge that [Appvion's] stock value was overstated." The court observed that the ESOP "concedes that it cannot state a claim for aiding and abetting fraud against PwC and RSM because the fraud claims … are preempted by the Employee Retirement Income Security Act (ERISA)," and it dismissed those claims as well. On the ESOP's professional negligence and negligent misrepresentation claims, the court held that PwC and RSM "did not owe the ESOP a duty because the ESOP ha[d] not alleged it relied solely on [PwC's and RSM's] audit opinions to its detriment." As the court stressed, "PwC and RSM were [not] auditors … for the ESOP."

¶12 The ESOP moved for reconsideration of the circuit court's decision and for leave to amend its complaint. According to the ESOP, the court's analysis was flawed because it used the word "solely," which misstated the reliance analysis. On April 26, 2024, the circuit court denied the motions for reconsideration and for leave to amend the ESOP's complaint. In its written decision, and as relevant here, the court clarified that while "'solely' was not the right word choice," "the allegations in this case did not present a situation even remotely akin to the 'triangular relationship' described" in *Krier v. Vilione*, 2009 WI 45, 317 Wis. 2d 288, 766 N.W.2d 517. "Therefore," the court explained, "it was not reasonably foreseeable to [PwC and RSM] that the ESOP would rely on

---

[4] PCAOB stands for the "Public Company Accounting Oversight Board," which is the "government agency overseen by the Securities and Exchange Commission that" became effective in 2003 and that "promulgates auditing standards governing audits of public companies."

[their] work when presenting [Appvion] stock purchase prices which deviated from the stock valuations." The ESOP appeals.[5]

---

[5] The ESOP filed a notice of appeal from the circuit court's August 1, 2023 order. After the ESOP moved for reconsideration, we stayed appellate proceedings pending the circuit court's decision on that motion. The ESOP, thereafter, filed an amended notice of appeal on May 16, 2024, which also sought appellate review of the circuit court's April 26, 2024 order denying reconsideration. Furthermore, both PwC and RSM were originally designated as defendants-respondents in this appeal, but on March 3, 2025, the ESOP filed with this court a "Notice of Voluntary Dismissal with Prejudice" as to RSM. In response, we ordered the caption modified to reflect that PwC is the sole defendant-respondent. Finally, we acknowledge that the ESOP seeks to revive only its claims for professional negligence and negligent misrepresentation against PwC.

We also pause to note that the ESOP's counsel has failed to comply with aspects of the Rules of Appellate Procedure. Throughout its brief-in-chief and reply brief, the ESOP cites almost exclusively to the appendix that was submitted with its brief without including parallel citations to the appellate record that was compiled by the clerk of the circuit court. We remind counsel that the appendix is not the record and that the Rules of Appellate Procedure require parties to include appropriate citations to the record. *See United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322; WIS. STAT. RULE 809.19(1)(d)-(e) (2023-24). Additionally, some record citations in the briefs are to record documents generally, with no pinpoint citation to the page of the document. These citations also violate the Rules of Appellate Procedure. *See* RULE 809.19(1)(d)-(e) (2023-24). A reviewing court is not required to sift through the record to support a party's contentions. *Siva Truck Leasing, Inc. v. Kurman Distribs.*, 166 Wis. 2d 58, 70 n.32, 479 N.W.2d 542 (Ct. App. 1991). Failure to follow these rules unnecessarily adds to the work of this high-volume court.

It further appears that excerpts from Appvion's 2014 Form 10-K were included in the ESOP's appendix. The index for the appendix fails to cite a docket number for that document and instead lists "NA." The ESOP's brief-in-chief further states: "The Complaint in this case incorporates PDC and Appvion's [Form] 10-Ks by reference and cites them throughout. Appellant has included the relevant portions of the 2014 [Form] 10-K filing in the Appendix as an example." (Citations omitted.) These notations lead us to believe that this document was not made part of the appellate record. Our review on appeal is limited to materials in the record, *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), and we will not consider any materials in an appendix that are not in the record, *State v. Smith*, 100 Wis. 2d 317, 322, 302 N.W.2d 54 (Ct. App. 1981), *overruled on other grounds by*, *State v. Firkus*, 119 Wis. 2d 154, 350 N.W.2d 82 (1984). Consequently, we have disregarded that portion of the appendix. Although PwC and RSM included Form 10-K filings as attachments to their motions to dismiss that are properly within the record, it is unclear whether those documents are the same as that provided in the ESOP's appendix. We caution counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version.

**DISCUSSION**

¶13    As was alluded to above, the ESOP's theory of recovery in this case postulates that had PwC not been negligent, the fraudulent scheme orchestrated by Appvion's management and professional advisors as alleged in the federal case may have been identified earlier, the ESOP and its employee beneficiaries would have been alerted to the inflated stock purchase price, and the ESOP would not have continued to overpay for Appvion stock. This theory, however, rests on the ESOP's claim of its alleged reliance on PwC's audit opinions, where the ESOP was not PwC's client.

¶14    Under the facts of this case, and for the reasons that follow, we conclude that the ESOP's pleadings failed to sufficiently demonstrate that PwC had a duty to the ESOP to discover that Appvion's stock price was overstated, to advise the ESOP about the value discrepancy, or to refuse to certify Appvion's financial statements. The ESOP was not PwC's client, and given the circumstances of the parties' relationship, the ESOP's negligence claims contravene established Wisconsin law in *Krier*. That case permits auditor liability to third parties where the auditor, the client, and the third party are in a "triangular-relationship," such that it is reasonably foreseeable that the third party will rely on the auditor's work. *See Krier*, 317 Wis. 2d 288, ¶¶42-44. The ESOP's pleadings fail to show a triangular relationship existed between PwC, Appvion, and the ESOP, and, as a result, neither the ESOP nor Appvion's employees can establish that they *reasonably* relied upon PwC's audits to their detriment. We therefore affirm the circuit court's decision to grant PwC's motion to dismiss on the grounds that PwC owed no duty to the ESOP and that the ESOP

has no basis to claim that PwC would reasonably foresee that the ESOP would rely upon PwC's audit reports and continue to overpay for Appvion stock.[6]

¶15 As stated above, this case comes before us on PwC's motion to dismiss. "A motion to dismiss a complaint for failure to state a claim tests the legal sufficiency of the complaint." *Watts v. Watts*, 137 Wis. 2d 506, 512, 405 N.W.2d 303 (1987). "When we review a motion to dismiss, factual allegations in the complaint are accepted as true for purposes of our review," as well as all "reasonable inferences" that arise from the allegations. *Data Key Partners*, 356 Wis. 2d 665, ¶¶18-19. "Plaintiffs must allege facts that plausibly suggest they are entitled to relief." *Id.*, ¶31. "However, legal conclusions asserted in a complaint are not accepted, and legal conclusions are insufficient to withstand a motion to dismiss." *Id.*, ¶18. Whether the complaint states a claim for relief is a question of law that we review independently. *Friends of Kenwood v. Green*, 2000 WI App 217, ¶11, 239 Wis. 2d 78, 619 N.W.2d 271.

¶16 In Wisconsin, the elements of a negligence claim are "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the [breach]." *Hoida, Inc. v. M&I Midstate Bank*, 2006 WI 69, ¶23, 291 Wis. 2d 283, 717 N.W.2d 17 (alteration in original; citation omitted); *Gorton v. American*

---

[6] On appeal, PwC asserts several alternative theories to support the circuit court's decision to dismiss the ESOP's complaint. As a general rule, this court decides cases on the narrowest possible grounds. *See Patrick Fur Farm, Inc. v. United Vaccines*, *Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707. Accordingly, we "need not address every issue raised by the parties when one issue is dispositive." *Barrows v. American Fam. Ins.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013).

*Cyanamid Co.*, 194 Wis. 2d 203, 223, 533 N.W.2d 746 (1995) (noting that the same elements are required for negligent misrepresentation claims). Even if the plaintiff establishes all four of these elements, a court may still preclude liability based on public policy factors. *Hoida*, 291 Wis. 2d 283, ¶24.

¶17 In its complaint, the ESOP alleged that "PCAOB Standards required PwC … to, among other things, read, review and understand the [Appvion] stock valuations, and determine whether the valuations supported the material assertions in the financial statements." The ESOP further alleged that PwC's audit opinions "communicated to the users of the financial statements that the value of redeemable common stock and its underlying valuation were in conformity with" generally accepted accounting principles "and that the disclosures about the valuations were likewise in conformity with [generally accepted accounting principles] and were materially accurate, fairly presented and not misleading."

¶18 According to the ESOP, because it was Appvion's sole shareholder, it was foreseeable to PwC that the ESOP and the employee beneficiaries would rely on PwC's audit opinions, which were provided to the employees in the Form 10-Ks, "when deciding how much to pay for the [Appvion] stock and whether to continue to invest in the ESOP." Therefore, "[h]ad PwC … not been negligent, [it] would have either required that Appvion correct the stock price or refused to certify the financial statements," which would have exposed the overstated valuations, and "the employee beneficiaries would not have continued to divert a portion of their paychecks to fund the ESOP's purchase of additional inflated [Appvion] stock." Accordingly, the ESOP argues that the circuit court erred by applying our supreme court's decision in *Krier*. The ESOP asserts that "[b]ecause an audited financial statement necessarily involves a 'triangular relationship'

which includes the company's investors (shareholders)," the circuit court erred by concluding that PwC had no duty to the ESOP.

¶19     In contrast, PwC argues that the circuit court correctly dismissed the ESOP's complaint.  According to PwC, it "owed the ESOP no duty to audit the stock prices that the ESOP itself set.  The ESOP was not PwC's client, and it was not reasonably foreseeable that the ESOP would rely on PwC's audit opinions to set [Appvion's] share price."  Appvion did not determine the fair market value of its own common stock.  Rather, according to the record, the notes to Appvion's financial statements disclose the share price that the ESOP's trustee and valuation specialists had set, specifically stating that the trustee had set the share price in reliance on its own valuation specialist.

¶20     "Wisconsin has adopted the minority view from *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), which established that everyone owes a duty to the world at large."  *Hocking v. City of Dodgeville*, 2009 WI 70, ¶12, 318 Wis. 2d 681, 768 N.W.2d 552.  However, this viewpoint does not mean "that every negligence claim arrives at court with the first element already proven as a matter of law."  *Brenner v. Amerisure Mut. Ins.*, 2017 WI 38, ¶16, 374 Wis. 2d 578, 893 N.W.2d 193.  Duty is still an important element that must be established by the plaintiff, *id.*, but that duty "is restricted to what is reasonable under the circumstances," *Hocking*, 318 Wis. 2d 681, ¶12.  "[T]he test of negligence is whether the conduct foreseeably creates an unreasonable risk to others."  *Hoida*, 291 Wis. 2d 283, ¶22 (citation omitted).

¶21     Thus, the question in this case is whether PwC owed a duty of care to the ESOP.  Our state courts have previously addressed the extent to which an accountant owes a duty to a third party and may therefore be held liable.  *See*

*Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis. 2d 376, 335 N.W.2d 361 (1983); *Chevron Chem. Co. v. Deloitte & Touche*, 168 Wis. 2d 323, 483 N.W.2d 314 (Ct. App. 1992); *Krier*, 317 Wis. 2d 288, ¶¶35-46. The ESOP argues that *Citizens* and *Chevron* provide the controlling precedent in this case, while PwC and the circuit court contend that we should follow *Krier*.

¶22 In *Citizens*, Timm, Schmidt & Co., an accounting firm, prepared financial statements and an opinion letter representing that the statements "fairly presented the financial condition" of Clintonville Fire Apparatus, Inc., and Clintonville used those documents to obtain a loan from Citizens State Bank. *Citizens*, 113 Wis. 2d at 378-81. The accounting firm later discovered that the financial statements contained material errors, which ultimately led to Clintonville's liquidation. *Id.* at 378-79. Citizens Bank filed an action against the accounting firm for malpractice, arguing that it had loaned Clintonville money in reliance on the accountant's work. *Id.* at 379-81. Our supreme court determined that privity of contract was not required for an accountant to be liable to a third party. *Id.* at 385. Instead, because the accountant prepared the documents knowing that the bank would rely on the documents to make loan decisions, the court concluded that the accountant could reasonably anticipate liability for that malpractice. *Id.* at 388.

¶23 In *Chevron*, American Fuel & Supply Co. hired Deloitte & Touche as an independent auditor. *Chevron*, 168 Wis. 2d at 327-28. In that capacity, Deloitte prepared a report of American Fuel's financial statements, which was distributed to American Fuel's creditors, including Chevron. *Id.* at 328. Chevron relied upon Deloitte's report in deciding to extend credit to American Fuel. *Id.* Deloitte later discovered an error in that report, and Deloitte's recalculation revealed that American Fuel was operating at a deficit rather than making a profit.

*Id.* Deloitte urged American Fuel to recall the report, but American Fuel refused and threatened legal action against Deloitte if it revealed the error. *Id.* at 328-29. After American Fuel filed for bankruptcy, Chevron filed an action against Deloitte alleging both negligence in the audit and misrepresentation. *Id.* at 329. Relying on *Citizens*, this court concluded that because Deloitte prepared the report knowing that a third party would rely on it, and Chevron took action based on the report to its detriment, Deloitte could be held responsible under third-party liability. *Chevron*, 168 Wis. 2d at 334-35 & n.17.

¶24 Finally, in *Krier*, the question before our supreme court was whether the plaintiffs, who were not shareholders in EOG Environmental, had standing to bring claims against EOG Environmental's accountants for damages allegedly caused by the accountants' failure to disclose, failure to prevent, or assistance in the misappropriation of funds from EOG Environmental. *Krier*, 317 Wis. 2d 288, ¶2. The court explained that "an accountant has a duty to his or her client and may have a duty to a third party under certain circumstances." *Id.*, ¶20. According to the court, "[w]hile privity of contract is not required for an accountant to be liable to a third party," "foreseeable reliance to one's detriment" by a third party "can reasonably create a third-party cause of action against an accountant." *Id.*, ¶43.

¶25 As relevant here, our supreme court distinguished the case from *Citizens* and *Chevron*. *Krier*, 317 Wis. 2d 288, ¶¶37-46. According to the court, "[i]n both *Citizens* and *Chevron,* the accountant, the third party, and the accountant's client formed a 'triangular-relationship'" because "[t]he client relied on the third party to receive a loan, and the third party relied on the accountant's documentation to determine whether to loan the money." *Krier*, 317 Wis. 2d 288, ¶43. Important to the *Krier* court was the fact that "the accountant, the client, and the bank or creditor" in *Citizens* and *Chevron* "were all aware of the fact that the

statements were prepared for the bank or creditor to review and that based upon that information, the bank or creditor would decide whether to loan money or extend credit." ***Krier***, 317 Wis. 2d 288, ¶43. Because those circumstances were not present in ***Krier***, the court concluded that "[t]he plaintiffs' claims f[ell] short of showing a breach of an independent duty that the accountant owed to them and how these damages resulted from that breach." ***Id.***, ¶35.

¶26 In this case, we conclude that the circuit court properly dismissed the ESOP's claims for negligence against PwC based on its application of ***Krier***. As our supreme court explained in ***Krier***, for a nonclient to plead a third-party negligence claim against an accountant, that nonclient must allege facts sufficient to demonstrate that it foreseeably relied to its detriment on the accountant's work. *See **id.***, ¶43. Here, the ESOP has failed to allege reasonably foreseeable reliance. In other words, the ESOP does not sufficiently plead facts to support its claim that PwC knew or should have known that the ESOP would use PwC's audit opinions "when deciding how much to pay for the [Appvion] stock and whether to continue to invest in the ESOP" or that it was reasonably foreseeable to PwC that the ESOP would do so.

¶27 In reality, the circumstances and the relationship of the parties demonstrate that it was *not* reasonably foreseeable that the ESOP would rely on PwC's audit opinion. As the complaint explained, the ESOP's governing documents stated that responsibility for determining the fair market value of the stock purchase price fell to an independent appraiser—not PwC—and the stock purchase price was approved and finalized by the ESOP's own trustee. *See also* 29 U.S.C. § 1002(18) (stating that "adequate consideration" for a security with no

"generally recognized market" must be "determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan").[7] As noted, the trustee hired Willamette and Stout as the independent appraisers for this purpose. Accordingly, an example of a disclosure in the ESOP's financial statements was as follows:

> The trustee of [Appvion's] common stock account, Argent Trust Company, is responsible for determining the value of [Appvion's] common stock. Argent Trust Company relies upon Stout …, an independent third party, to conduct a valuation of the company and [Appvion] and to assist in determining the fair value of [Appvion's] common stock at year end.

The ESOP also had its own financial statement auditor, Baker Tilly, and Baker Tilly addressed its report specifically to the ESOP's trustee.[8] Therefore, given all the parties working directly with the ESOP's trustee to determine and, presumably, review Appvion's stock purchase price, PwC would not reasonably foresee that the ESOP and its plan participants, as nonclients, would act in reliance

---

[7] Furthermore, ERISA required the ESOP to file an annual report containing, among other things, "a statement of the assets and liabilities of the plan aggregated by categories and valued at their current value." *See* 29 U.S.C. § 1023(b)(3)(A). As PwC argues, this would have included the ESOP's stock in Appvion. This statement was to be either audited by "an independent qualified public accountant," *see* § 1023(a)(3)(A), or certified as accurate by the trustee, *see* 29 C.F.R. § 2520.103-8. Thus, PwC emphasizes that "[n]o such responsibility was given to PwC, or even to PwC's client [Appvion]."

[8] The ESOP argues, however, that Baker Tilly did not certify the ESOP's financial statements. According to the ESOP, "Baker Tilly conducted audits of the ESOP which were filed with the Department of Labor. However, Baker Tilly specifically warned that it had not audited the value of the ESOP assets: 'the plan administrator [Appvion] instructed us not to perform, and we did not perform, any auditing procedures with respect to the investment information summarized in Note 3.'" *See also* 29 C.F.R. § 2520.103-8. The ESOP explains that "Note 3 to the financial statements was the value of the ESOP's investments, including the value of the [Appvion] stock." Thus, the ESOP essentially contends that, because it directed its own auditor not to perform certain duties based on its reliance on its own trustee's certification, the duty that would have otherwise fallen on Baker Tilly should instead be attributed to PwC. We are unpersuaded by the ESOP's argument.

on *PwC's* audit opinion with respect to the stock purchase price that the ESOP's trustee set in reliance on its own independent appraiser.

¶28 Moreover, as the circuit court found, PwC's audit offered no opinion as to whether Appvion's stock purchase price was correct, nor did it provide any advice or recommendation as to whether the ESOP or the plan participants should continue to invest in Appvion. The audit opinions do not even mention the stock purchase price or otherwise suggest PwC's agreement with that figure; they merely opine that the balance sheets and statements of operations "present fairly, in all material respects, the financial position of" Appvion. Unlike in **Citizens** and **Chevron**, where the auditors knew the lenders would look to their audit opinions when assessing whether to extend a loan, PwC's audit opinions do not address the stock's purchase price or opine on its valuation, so it was not reasonably foreseeable that the ESOP would have relied on PwC's complete lack of an opinion regarding the stock's valuation to determine the accuracy of the stock purchase price.[9]

---

[9] The ESOP counters that PwC directly addressed its audit opinions "To the Shareholder and Board of Directors of [Appvion] and Subsidiaries," and the ESOP was the sole shareholder. Thus, the ESOP argues that it and its plan participants were foreseeable, known users of the financial statements.

We disagree that PwC's mere designation "To the Shareholder" is sufficient to make the ESOP's reliance on the audit for the purpose of determining the accuracy of the stock purchase price reasonably foreseeable. **Krier v. Vilione**, 2009 WI 45, 317 Wis. 2d 288, 766 N.W.2d 517, did not hold that mere awareness that a third party *might* rely on an auditor's work suffices to create a duty. As the court explained,

(continued)

17

¶29    Additionally, PwC notes that the ESOP's trustee set Appvion's stock purchase price on June 30 and December 31 each year, which was before PwC prepared its financial statements for the year. "Thus," argues PwC, "by the time PwC released its audit opinion related to [Appvion's] financial statements in any given year, any damage to the ESOP was already done." We agree that this chronology—i.e., the stock purchase price being set long before PwC's audit—casts doubt upon whether the ESOP's reliance was reasonable.

¶30    In summary, PwC, which had no professional or contractual relationship with the ESOP, would have no basis to know or reasonably foresee that the ESOP would rely on PwC's audit opinions to make decisions about the fairness and accuracy of Appvion's stock purchase price that the ESOP's own trustee and independent appraiser had set. Under these circumstances, we agree with the circuit court's conclusion that the ESOP's "allegations … did not present a situation even remotely akin to the 'triangular relationship' described by the *Krier* case. Therefore, it was not reasonably foreseeable to [PwC] that the ESOP

---

> In [*Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis. 2d 376, 335 N.W.2d 361 (1983)] and [*Chevron Chem. Co. v. Deloitte & Touche*, 168 Wis. 2d 323, 483 N.W.2d 314 (Ct. App. 1992)], the accountant, the client, and the bank or creditor were all aware of the fact that the statements were prepared for the bank or creditor to review and that based upon that information, the bank or creditor would decide whether to loan money or extend credit. As a result, the accountant could reasonably be held liable to that third party for his or her malpractice.

*Krier*, 317 Wis. 2d 288, ¶43. The ESOP then goes a step further to claim that "[i]t is not necessary for the accountant to know the specific persons who might rely on the financial statements, as long as they were aware third parties might rely on them," but that assertion is not the holding of *Citizens*, *Chevron*, or *Krier*. The issue is whether the reliance is reasonably foreseeable under the circumstances.

18

would rely on [PwC's] work when presenting [Appvion's] stock purchase prices which deviated from the stock valuations."

¶31    The ESOP attempts to distinguish *Krier* on its facts, however, and further faults the circuit court for "ignoring *Citizens*['] … clearly articulated standard." First, we are unpersuaded by the ESOP's argument that the factual differences between the relationships among the various entities in *Krier* render the holding in that case inapplicable here. Our supreme court did not narrow its holding in *Krier* to that specific business scenario. Further, the *Krier* court's holding on derivative claims is not relevant to the issue presented here because the ESOP is not seeking to bring derivative claims against PwC on behalf of Appvion.

¶32    Second, the ESOP's assertion that the circuit court ignored *Citizens* fails to acknowledge that *Krier* did not replace or overturn the court's holding in *Citizens*. As the ESOP admitted, rather than departing from precedent, the *Krier* court affirmed that *Citizens* sets forth the controlling framework for third-party accountant liability under Wisconsin's negligence principles. *See Krier*, 317 Wis. 2d 288, ¶37. The *Krier* decision merely built upon that framework by delineating its boundaries. *See id.*, ¶36 ("If the plaintiffs' theory prevailed, there would be no limit to the kinds of claims that other persons who have a 'relationship' with a corporation could bring, and thus, available claims for relief would only be limited by one's imagination."). In other words, by relying on *Krier*, we continue to apply the foundational standard in *Citizens*. At bottom, this case more closely resembles the circumstances in *Krier* than those in *Citizens*.

¶33    The ESOP also contends that it automatically satisfies the standard in *Krier* because "every audit opinion forms a 'triangular relationship,'" given that "[a]udit opinions, by their very nature, are triangular relationships among

management, the investing public and the auditor." (Formatting altered.) The ESOP fails to identify a Wisconsin case in support of this proposition, but it does cite *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal. 1992), for the proposition that an audit "assists the client in convincing third parties that it is safe to extend credit or invest in the client." *Id.* at 751 (citation omitted). And it also argues that "the independent auditor assumes a *public* responsibility transcending any employment relationship with the client" as a "public watchdog." *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984).[10]

¶34 We are unpersuaded by either of the ESOP's arguments that we should adopt a blanket rule that "every audit opinion forms a 'triangular relationship'" or that the triangular relationship is the wrong test. First, it is not clear to us what the ESOP means by "wrong test." If the ESOP is merely suggesting that *Krier* is inapplicable here, we have already explained why that is not the case. If the ESOP is instead arguing for us to remove the requirement of a triangular relationship from the case law, we are bound by our supreme court's holding in *Krier*. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) ("The supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case.").

¶35 Second, as to the creation of a blanket rule, the cases cited by the ESOP do not stand for that proposition. Further, the ESOP was not a passive shareholder—i.e., part of the investing public. It bears repeating that the ESOP

---

[10] Interestingly, after expounding on the significance of audit opinions as evidence of an inherently triangular relationship, the ESOP shifts course in its reply brief. Rather than continuing to argue that every audit opinion forms a triangular relationship, the ESOP argues in its reply that "a triangular relationship is the wrong test because the purpose of an audit is to provide financial statements to third parties."

was the sole owner of Appvion, which was not publicly traded, and that the ESOP's own trustee, in conjunction with its own valuation specialist, set the stock's purchase price. Therefore, to the extent that the cases cited by the ESOP could arguably support a blanket triangular relationship rule for audit opinions when the entity is a publicly traded company, that is not the case here. Under the circumstances, the ESOP's arguments and case citations are irrelevant.

¶36 Finally, the ESOP argues that the circuit court erred by failing to conduct a public policy analysis,[11] which it contends *Citizens* requires. Citing *Alvarado v. Sersch*, 2003 WI 55, 262 Wis. 2d 74, 662 N.W.2d 350, the ESOP states "that 'duty is nothing more than an ingredient in the determination of negligence. Once it has been determined that a negligent act caused the harm, the question of duty is irrelevant and a finding of nonliability can be made only in terms of public policy.'" *Id.*, ¶15 (citations omitted). The ESOP then recognizes that our supreme court has "cautioned against making this public policy determination at the motion to dismiss stage." *See Citizens*, 113 Wis. 2d at 387.

---

[11] Our supreme court has explained that "[s]ome of the public policy reasons for not imposing liability despite a finding of negligence as a substantial factor producing injury are" as follows:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Morgan v. Pennsylvania Gen. Ins.*, 87 Wis. 2d 723, 737, 275 N.W.2d 660 (1979).

Thus, the ESOP argues that "[t]here is no public policy reason to dismiss the ESOP's claims, especially on a motion to dismiss."

¶37    We conclude that the circuit court was not required to conduct a public policy analysis in this case.  Initially, we note that beyond citing *Alvarado* and *Citizens*, which do not explicitly require a public policy analysis under these circumstances, the ESOP fails to cite any legal authority in support of its position that a public policy analysis was required.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

¶38    Our supreme court has explained that

> Wisconsin courts have … reserved the right to deny the existence of a negligence claim based on public policy reasons: "[I]n Wisconsin, even if all the elements for a claim of negligence are proved, or liability for negligent conduct is assumed by the court, the court nonetheless may preclude liability based on public policy factors."

*Hoida*, 291 Wis. 2d 283, ¶24 (alteration in original) (quoting *Smaxwell v. Bayard*, 2004 WI 101, ¶39, 274 Wis. 2d 278, 682 N.W.2d 923).  The court went on to clarify that "[t]he analysis of the four elements necessary to state a claim for actionable negligence is the *first* consideration for a court when deciding motions for summary judgment, even if an appellate court can directly consider the judicial public policy factors to preclude liability when the facts are particularly clear." *Id.*, ¶25 (emphasis added).

¶39    Expressed differently, the public policy factors are applied *after* the elements of a negligence claim have been pled or established by a factfinder to *preclude* liability; the factors are not used to *create* liability where negligence cannot be demonstrated.  *See id.* ("[N]egligence and liability are distinct

22

concepts." (citation omitted)); ***Citizens***, 113 Wis. 2d at 387 (stating that "policy factors *preclude* the imposition of liability for negligent acts" (emphasis added)). Here, the ESOP has failed to state a claim for negligence; therefore, there is no requirement to consider whether public policy factors would *also* preclude liability.

¶40     Further, by citing ***Alvarado*** for its statement that the "question of duty is irrelevant" in an attempt to circumvent ***Krier***, we can only assume that the ESOP meant to suggest that ***Krier***'s holding, to the extent it rested on a duty requirement, has been overruled.  Insofar as this is the ESOP's argument, ***Alvarado*** has not overruled ***Krier***.  Instead, courts have actually questioned ***Alvarado***'s language.  *See **Brenner***, 374 Wis. 2d 578, ¶¶16-17 ("This characterization … suggests we have concluded that every negligence claim arrives at court with the first element already proven as a matter of law, or that we have eliminated the first line from the negligence quatrain.  We have not."); *see also **Cattau v. National Ins. Servs. of Wis.***, No. 2016AP493, unpublished slip op., ¶23 & n.10 (WI App June 13, 2018), *aff'd*, 2019 WI 46, 386 Wis. 2d 515, 926 N.W.2d 756 (discussing the "shift[]" in the analysis of duty).[12]

¶41     In summary, we conclude that the circuit court correctly applied the principles set forth in ***Krier*** to the circumstances presented here.  We agree that the ESOP failed to state viable claims for professional negligence or negligent misrepresentation against PwC as a matter of law because PwC did not serve as the ESOP's auditor, and it was not reasonably foreseeable that the ESOP or

---

[12] An unpublished opinion that is authored by a member of a three-judge panel and issued on or after July 1, 2009, may be cited for its persuasive value.  WIS. STAT. RULE 809.23(3)(b).

Appvion's employees would rely on PwC's audit opinions to determine whether Appvion's stock purchase price was correct and whether to purchase Appvion stock. Given the lack of any professional or contractual relationship between PwC and the ESOP, we agree that PwC bore no duty to the ESOP and could not reasonably have anticipated the ESOP's reliance. We therefore affirm the circuit court's decision granting PwC's motion to dismiss.[13]

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[13] On appeal, the ESOP also challenges the circuit court's decision on reconsideration. The ESOP explains that in the court's initial decision on the motions to dismiss, "the court found that '[PwC and RSM] did not owe the ESOP a duty because the ESOP has not alleged it relied *solely* on [PwC's and RSM's] audit opinion[s] to its detriment.'" (Emphasis added.) Although the ESOP acknowledges that "[o]n reconsideration, the [c]ircuit [c]ourt attempted to walk back this language," it argues that "the court's analysis still centered on to what extent the ESOP had actually relied on PwC['s] and RSM's audit certifications given other available sources of information." The ESOP contends this issue "is a separate[,] distinct factual inquiry which is not relevant to the existence of a duty, and gives rise to questions of fact, that cannot be resolved at the motion to dismiss stage." For the reasons discussed above, we disagree that the circuit court's analysis was incorrect. This "factual inquiry" was relevant to the question of the relationship between the parties and the foreseeability of the ESOP's reliance.

24